# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 19, 2006      Decided February 16, 2007

No. 05-5379

MOUNT ROYAL JOINT VENTURE *ET AL.*,
APPELLANTS

v.

DIRK KEMPTHORNE, SECRETARY OF THE INTERIOR, *ET AL.*,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 99cv02728)

*Steven J. Lechner* argued the cause for the appellants. *William Perry Pendley* was on brief.

*John L. Smeltzer*, Attorney, United States Department of Justice, argued the cause for the appellees. *Matthew J. Sanders*, Attorney, United States Department of Justice, was on brief.

Before: HENDERSON, ROGERS and GRIFFITH, *Circuit Judges*.

Opinion filed for the court by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The appellants, Mount Royal Joint Venture (Mount Royal) and Pete and Maxine Woods (Woods family), challenge a district court

decision upholding certain actions taken by the Department of the Interior (DOI) in managing federal public lands in the Sweet Grass Hills of Montana (Hills) under the Federal Land Plan and Management Act of 1976, as amended, 43 U.S.C. §§ 1701-82 (FLPMA). Specifically, the appellants challenge the Interior's Board of Land Appeals's (IBLA) affirmance of the Board of Land Management's (BLM) decision declaring void *ab initio* the appellants' mining claims located within 19,764.74 acres of land in the Hills segregated from mineral location and entry. They claim that DOI effected consecutive two-year segregations in violation of FLPMA. The appellants also challenge as arbitrary and capricious Public Land Order 7254 (PLO 7254) in which the DOI Secretary (Secretary) withdrew from mineral location and entry 19,685 acres of land in the Hills for 20 years. As detailed below, we hold that the IBLA's interpretation of FLPMA section 1714(b) to allow consecutive segregation periods with different purposes is reasonable, that the IBLA's conclusion that the two segregation periods were not identical was not arbitrary or capricious and that the Secretary's withdrawal was not arbitrary or capricious and does not violate the Establishment Clause of the First Amendment to the United States Constitution.

## I.

We first outline the statutory framework that governs the withdrawal of public lands. We then set forth the facts that led to this appeal.

### A. Statutory Background

FLPMA provides that "it is the policy of the United States that . . . the Congress exercise its constitutional authority to withdraw . . . Federal lands for specified purposes and that Congress delineate the extent to which the Executive may

withdraw lands without legislative action." 43 U.S.C. § 1701(a)(4). A "withdrawal" means:

> withholding [of] an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program.

*Id.* § 1702(j).

Section 1714 outlines the withdrawal authority of the Executive. Section 1714(a) authorizes the Secretary "to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section." *Id.* § 1714(a). Subsection (b) of 1714 sets out the withdrawal process as follows:

> Within thirty days of receipt of an application for withdrawal, and whenever he proposes a withdrawal on his own motion, the Secretary shall publish a notice in the Federal Register stating that the application has been submitted for filing or the proposal has been made and the extent to which the land is to be segregated while the application is being considered by the Secretary. Upon publication of such notice the land shall be segregated from the operation of the public land laws to the extent specified in the notice. The segregative effect of the application shall terminate upon (a) rejection of the application by the Secretary, (b) withdrawal of lands by the Secretary, or (c) the expiration of two years from the date of the notice.

*Id.* § 1714(b)(1).[1]  According to FLPMA's implementing regulations, a "segregation" is "the removal for a limited period, subject to valid existing rights, of a specified area of the public lands from the operation of the public land laws . . . pursuant to the exercise by the Secretary of regulatory authority to allow for the orderly administration of the public lands."  43 C.F.R. § 2300.0-5(m).

Subsections (c) and (d) of section 1714 describe the procedures by which the Secretary implements a withdrawal. With respect to a land tract aggregating 5,000 acres or greater, section 1714(c) imposes a 20-year withdrawal maximum and requires the Secretary to "notify both Houses of Congress of such a withdrawal no later than its effective date."  Section 1714(c) further states, "[T]he withdrawal shall terminate and become ineffective at the end of ninety days . . . beginning on the day notice of such withdrawal has been submitted to the

---

[1]Although the "application for withdrawal" mentioned in subsection (b)(1) is not otherwise described, the regulations define a "withdrawal proposal" as a "withdrawal petition approved by the Secretary,"  43 C.F.R. § 2300.0-5(q), and a "withdrawal petition" as "a request, originated within the [DOI] and submitted to the Secretary, to file an *application for withdrawal*," *id.* § 2300.0-5(p) (emphasis added).  Consequently, a "withdrawal petition" approved by the Secretary becomes a "withdrawal proposal" that results in a "withdrawal application."  Publication of a "withdrawal proposal" in the Federal Register initiates a segregation period lasting up to two years during which period the activities specified in the notice are restricted.  *Id.* § 2310.2(a).  "Before [an] authorized officer can take action on a withdrawal proposal, a withdrawal application in support thereof shall be submitted."  *Id.* § 2310.1-2(b).  An application for withdrawal may be submitted simultaneously with "the making of a withdrawal proposal," *id.*, or with a "withdrawal petition," *id.* § 2310.1-3(c).

Senate and the House of Representatives, if the Congress has adopted a concurrent resolution stating that such House does not approve the withdrawal."  As we stated in *New Mexico v. Watkins*, 969 F.2d 1122, 1136 (D.C. Cir. 1992), "[t]he reporting requirement is not just a formality.  It is instead a fundamental part of the scheme by which Congress has reserved the right to disapprove administrative withdrawals."  With respect to a land tract aggregating fewer than 5,000 acres, subsection (d) authorizes the Secretary to approve a withdrawal without congressional notification or approval:

   **(1)** for such period of time as he deems desirable for a resource use; or

   **(2)** for a period of not more than twenty years for any other use . . . ; or

   **(3)** for a period of not more than five years to preserve such tract for a specific use then under consideration by the Congress.

43 U.S.C. § 1714(d).  A "resource use" is "a land use having as its primary objective the preservation, conservation, enhancement or development of" any "natural resource . . . including, but not limited to, mineral, timber, forage, water, fish or wildlife resources" or "[a]ny resource value" in a particular land area "including, but not limited to, watershed, power, scenic, wilderness, clean air or recreational values."  43 C.F.R. § 2300.0-5(g).

### B. Factual Background

The United States owns 7,731 surface acres and 19,765 subsurface acres in the Sweet Grass Hills, an area of plains and volcanic buttes located in Montana near the Canadian border. The Hills are within the West HiLine planning area, a land tract in north central Montana encompassing over 11 million acres.

Most of the West HiLine planning area is privately owned, with BLM managing only 626,098 surface acres and 1,328,014 subsurface acres.

In 1988, BLM issued the "West HiLine Resource Management Plan and Final Environmental Impact Statement" (West HiLine Plan), a land use plan[2] for all BLM-managed tracts in the West HiLine area. The West HiLine Plan designated 7,640 surface acres of the Hills as an area of critical environmental concern (ACEC) and in January 1992, BLM's Montana State Director (State Director) issued a Record of Decision (ROD) adopting the West HiLine Plan for the Hills. With the ACEC designation, BLM sought "to protect high value potential habitat for reintroduction of endangered peregrine falcons; protect areas of traditional religious importance to Native Americans; and protect seasonally important elk and deer habitat." Record of Decision for the Sweet Grass Hills and the Upper Missouri National Wild and Scenic River of the Final West HiLine Resource Management Plan and Environmental Impact Statement 4 (Jan. 1992) (hereinafter 1992 ROD), *reprinted in* Joint Appendix (JA) at 211. Nevertheless, "[t]o ensure the orderly development of locatable mineral resources while protecting the ACEC values," *id.*, BLM kept the ACEC open to mineral location and entry.[3]

---

[2]Under FLPMA, the Secretary must "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a). A "resource management plan" is "a land use plan as described by the Federal Land Policy and Management Act." 43 C.F.R. § 1601.0-5(n).

[3]Mineral "location" is "the act or series of acts whereby the boundaries of [a] claim are marked." *Cole v. Ralph*, 252 U.S. 286, 296 (1920). "Mineral entry" refers to "[t]he right of entry on public

Pursuant to the ROD's requirements, Mount Royal and Manhattan Minerals (USA), Ltd. (Manhattan Minerals) filed a plan of operations in 1992 (Mount Royal/Manhattan Plan or Plan) to begin gold mining operations in the Hills. BLM withheld approval of the Mount Royal/Manhattan Plan until it completed a second environmental impact statement (EIS) specifically assessing the Plan's effect on non-mineral resources in the Hills. In January 1993, BLM released a draft EIS in which it analyzed, *inter alia*, the Hills's religious significance to various Native American tribes and whether its aquifers provided potable water to local residents. Based on its analysis, BLM proposed three alternatives for action, recommending as its preferred alternative the Mount Royal/Manhattan Plan. After receiving public comments of unequivocal opposition to the proposed mining activity, however, BLM decided to reevaluate the West HiLine Plan and, in particular, its recommendation to keep the Hills open to mineral location and entry.

To protect the Hills while it reassessed the West HiLine Plan, BLM filed with the DOI Assistant Secretary (Assistant Secretary) a petition/application to withdraw 19,684.74 acres of public mineral estate[4] in the Hills from mineral location and entry for 20 years pursuant to section 1714(c). On July 28,

---

land to mine valuable mineral deposits." Black's Law Dictionary (8th ed. 2004).

[4]Section 1719 indicates that a "mineral estate" is a property interest in *subsurface* mineral deposits. *See* 43 U.S.C. § 1719(a) ("All conveyances of title issued by the Secretary . . . shall reserve to the United States all minerals in the lands . . . except that if the Secretary makes the findings specified in subsection (b) of this section, *the minerals may then be conveyed together with the surface* to the prospective surface owner . . . .") (emphasis added).

1993, the Assistant Secretary approved BLM's petition and six days later, BLM published notice of the withdrawal proposal in the Federal Register (First Proposal), declaring that the proposed withdrawal sought "to protect high value potential habitat for reintroduction of endangered peregrine falcons, areas of traditional religious importance to Native Americans, aquifers that currently provide the only potable water in the area, and seasonally important elk and deer habitat." 58 Fed. Reg. 41,289, 41,290 (Aug. 3, 1993). Publication of the First Proposal effected a two-year segregation period (First Segregation) during which mineral location and entry in the Hills was prohibited. *Id.*; *see also* 43 U.S.C. § 1714(b)(1). As a result, on August 9, 1993, BLM suspended action on the Mount Royal/Manhattan Plan to "reassess[] long-term management options for the Sweet Grass Hills through preparation of an amendment to the [West HiLine Plan]," Letter from David L. Mari to Andrew Carstensen, Manhattan Minerals (US) Ltd. & Ernest K. Lehmann (Aug. 9, 1993), *reprinted in* JA at 305, and five weeks later, Manhattan withdrew from the joint venture with Mount Royal.

On August 26, 1993, BLM published notice of its intent to issue an amended West HiLine Plan and EIS (Amendment/EIS) in order "to address the proposed withdrawal" which was "not in conformance with the [RODs] for the [West HiLine Plan]" because the RODs permitted mineral location and entry. 58 Fed. Reg. 45,117, 45,117 (Aug. 26, 1993).[5] The amendment process

---

[5]Pursuant to FLPMA's implementing regulations, "All . . . resource management authorizations and actions . . . shall conform to [an] approved plan." 43 C.F.R. § 1610.5-3(a). "If a proposed action is not in conformance [with an approved plan], and warrants further consideration before a plan revision is scheduled, such consideration shall be through a plan amendment in accordance with the provisions

proceeded slowly and, in 1994, BLM became concerned that it could not complete the Amendment/EIS before the First Segregation terminated on August 2, 1995. It therefore sought alternative means to protect the Hills while the Amendment/EIS was pending. Initially, BLM considered attempting to withdraw the Hills by, in effect, extending the First Segregation time limit but DOI's Assistant Solicitor, believing that such action would violate FLPMA, instead recommended that BLM consider petitioning for an emergency withdrawal[6] or a withdrawal "in aid of legislation."[7]

On February 10, 1995, almost eighteen months after BLM decided to amend the West HiLine Plan, it released its draft Amendment/EIS to the public "address[ing] future management options for land tenure adjustment, off-road vehicle use, oil and gas leasing, and locatable mineral development for lands and minerals." 60 Fed. Reg. 8056, 8056 (Feb. 10, 1995). The Amendment/EIS proposed four alternatives for locatable mineral development in the Hills and recommended a 20-year withdrawal from mineral location and entry of 6,328 acres of

---

of § 1610.5-5 of this title." *Id.* § 1610.5-3(c). Section 1610.5-5 provides: "An amendment shall be initiated by . . . new or revised policy, a change in circumstances or a proposed action that may result in a change in the scope of resource uses or a change in the terms, conditions and decisions of the approved plan." *Id.* § 1610.5-5.

[6]Section 1714(e) permits "emergency withdrawals" if "an emergency situation exists and . . . extraordinary measures must be taken to preserve values that would otherwise be lost." 43 U.S.C. § 1714(e).

[7]A withdrawal "in aid of legislation" is one "for a specific use then under consideration by the Congress." 43 U.S.C. § 1714(d)(3).

public mineral estate located in the ACEC portion of the Hills. BLM scheduled public meetings and received written comments regarding the draft Amendment/EIS.

But BLM determined it would be unable to complete the Amendment/EIS before August 2, 1995; as a result, on February 17, 1995, it again published notice of its intent to amend the West HiLine Plan, this time proposing an amendment and environmental assessment (Amendment/EA) that addressed only mineral withdrawal. BLM planned to complete the Amendment/EA before the First Segregation expired on August 2, 1995, in order to stop mineral development and subsequently to complete the Amendment/EIS on all remaining issues. On May 11, 1995, it issued a draft Amendment/EA with two alternatives for mineral development, recommending a withdrawal of 19,685 acres of public mineral estate in the Hills (including the 6,328 acres in the ACEC) from mineral location and entry for 20 years. BLM informed the public that the draft Amendment/EA could be protested pursuant to 43 C.F.R. § 1610.5-2[8] and on June 14, 1995, Mount Royal did just that, delaying the Amendment/EA's implementation.

On June 29, 1995, BLM published a notice in the Federal Register that the First Segregation was due to expire on August 2nd. 60 Fed. Reg. 33,845, 33,845 (June 29, 1995). Realizing that it needed to take immediate action to protect the Hills, BLM began preparing an application for an emergency three-year withdrawal. In the meantime, the Congress became involved,

---

[8]Section 1610.5-2(a) provides: "Any person who participated in the planning process and has an interest which is or may be adversely affected by the approval or amendment of a resource management plan may protest such approval or amendment." 43 C.F.R. § 1610.5-2(a). The section also sets out the procedure for filing a protest.

when, on July 19, 1995, Congressman Pat Williams of Montana introduced legislation to permanently prohibit mineral location and entry "within the Bureau of Land Management's Sweetgrass Hills [ACEC] as identified in the West HiLine Resource Management Plan in the State of Montana." H.R. 2074, 104th Cong. § 2 (1995), *reprinted in* JA at 401. The bill recited: "For the purpose of conserving, protecting, and enhancing the exceptional scenic, wildlife, water quality, and cultural characteristics of lands along the Sweetgrass Hills in north central Montana, there is hereby established the Sweetgrass Hills Natural Area."[9] *Id.*, JA at 400-01. In response to the proposed legislation, BLM scrapped the emergency withdrawal and instead petitioned for an application to withdraw 19,764.74 acres in the Hills for two years "in aid of legislation" pursuant to section 1714(c). BLM published notice of the Secretary's approval of the petition in the Federal Register on July 28, 1995 (Second Proposal), declaring that the withdrawal proposal's "purpose" was to "preserve the status quo" and that its "specific objective" was:

> to protect high value potential habitat for reintroduction of endangered peregrine falcons, areas of traditional religious importance to Native Americans, aquifers that currently provide the only potable water in the area, and seasonally important elk and deer habitat, pending consideration of proposed withdrawal legislation introduced into the 104th Congress, 1st Session.

---

[9]Apparently, the Congress took no further action on the bill. *See* Thomas (The Library of Congress), http://thomas.loc.gov/ (last visited Nov. 28, 2006) (stating "Last Major Action" taken on bill was DOI request for comment on July 25, 1995).

60 Fed. Reg. 38,852, 38,853 (July 28, 1995). The publication of the Second Proposal effected a second two-year segregation from mineral location and entry in the specified acreage of the Hills (Second Segregation). On August 2, 1995, BLM withdrew the Amendment/EA, stating that it did "not consider all relevant alternatives." Memorandum from Tom Walker, Acting Assistant Director, Resource Assessment & Planning, to State Director, Montana (Aug. 2, 1995), *reprinted in* Supplemental Joint Appendix (Supp. JA) at 3.

Also in early August 1995, Mount Royal located six mining claims within the segregated area, and by September 15, 1995, the Woods family also located one mining claim within the segregated area. Both parties recorded the claims and paid the necessary fees but BLM declared all seven claims null and void *ab initio* because they had been located on land included in the Second Segregation. *See* IBLA 96-77; IBLA 96-112. In a consolidated appeal, IBLA affirmed BLM's declarations. *See Mount Royal Joint Venture*, 144 IBLA 277 (June 11, 1998).

In May 1996, BLM issued its final Amendment/EIS to the West HiLine Plan. BLM considered four alternatives, recommending that the Secretary withdraw from mineral location and entry 19,765 acres of public mineral estate in the Hills for 20 years. On January 30, 1997, BLM issued a ROD that approved withdrawal of 19,685 acres consistent with the First Proposal, stating, "A petition/application for withdrawal of the other 80 acres of public minerals will be submitted when necessary." Record of Decision and Resource Management Plan Summary for the approval of the Sweet Grass Hills Resource Management Plan Amendment and Environmental Impact Statement 1 (Jan. 1997), *reprinted in* JA at 633. Two months later, the Secretary issued PLO 7254, which withdrew from mineral entry and location 19,685 acres in the Hills for 20 years.

On October 15, 1999, Mount Royal and the Woods family filed suit in the district court challenging the Second Segregation and PLO 7254. The appellants and DOI both filed motions for summary judgment. The district court granted DOI's motion, *Mount Royal Joint Venture v. Babbitt*, No. 1:99cv02728 (D.D.C. filed Aug. 26, 2005)**,** and this appeal followed.

## II.

In reviewing *de novo* the district court's grant of summary judgment on DOI's administrative decisions, we directly review those decisions. *Castlewood Prods., LLC v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004). Under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06, we must affirm an agency's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, we will reverse an agency decision only if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

### A. The Second Segregation

Following the Secretary's approval of its July 15, 1993 withdrawal petition, BLM, on August 3, 1993, published notice in the Federal Register of its proposal to withdraw 19,684.74 acres of public mineral estate located in the Hills for 20 years "to protect high value potential habitat for reintroduction of endangered peregrine falcons, areas of traditional religious

importance to Native Americans, aquifers that currently provide the only potable water in the area, and seasonally important elk and deer habitat," 58 Fed. Reg. at 41,290, thus commencing the First Segregation. On July 28, 1995, after the Secretary approved its July 24th withdrawal petition and before the expiration of the First Segregation (on August 2, 1995), BLM published notice in the Federal Register of its proposal to withdraw 19,764.74 acres of public mineral estate located in the Hills for two years to "preserve the status quo" and to protect the same resource uses and values "pending consideration of proposed withdrawal legislation introduced into the 104th Congress, 1st Session," 60 Fed. Reg. at 33,853, thus commencing the Second Segregation. In upholding the Secretary's approval of two consecutive withdrawal petitions which triggered two consecutive segregation periods, the IBLA interpreted FLPMA as permitting (1) consecutive segregations initiated by withdrawal proposals with different stated purposes and (2) withdrawal of a land tract aggregating 5,000 acres or more for the purpose of aiding legislation. *Mount Royal Joint Venture*, 144 IBLA at 281. The IBLA also upheld the Second Segregation because the Second Proposal—which resulted in the Second Segregation—"was not identical" to the First Proposal in that the First Proposal sought "to protect the unique resources within the Sweet Grass Hills ACEC" with a 20-year withdrawal and the Second Proposal "was in aid of recently introduced Congressional legislation designed to protect the same resources" by means of a two-year withdrawal only. *Id.*

The appellants assert that approval of consecutive withdrawal petitions (i.e. consecutive proposals)—whether with identical or with ostensibly different purposes—contravenes FLPMA's purpose to limit a segregation to two years, Appellants' Br. at 17 (citing Public Land Law Review

Commission, *One Third of the Nation's Land* 56 (1970));[10] 21. Alternatively, they contend that even if the statute permits consecutive proposals with genuinely *different* purposes, the First and Second Proposals are "identical" in that the Second Proposal seeks "to preserve the status quo," Appellants' Br. at 20-21, and, under section 1714(c) and (d), the Secretary may not withdraw a land tract aggregating *more than* 5,000 acres "in aid of legislation." *Id.* at 23-24. Finally, the appellants argue that even if FLPMA permits a second segregation "in aid of legislation," the IBLA's decision upholding the Second Segregation was arbitrary and capricious because Congressman Williams's proposed legislation "was introduced simply to provide the BLM with an excuse to unlawfully extend the two-year segregation period." *Id.* at 27.

In reviewing an agency's interpretation of the laws it administers, we apply the principles of *Chevron U.S.A. Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984). First, we analyze the statute applying customary rules of statutory interpretation. *Id.* at 843. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If we conclude that "the statute is

---

[10]In 1964, the Congress created the Public Land Law Review Commission (PLLRC) "to study existing laws and procedures relating to the administration of the public lands of the United States." Pub. L. No. 88-606, § 2, 78 Stat. 982 (1964). In 1970, the PLLRC submitted its findings to the Congress in a report entitled, "One Third of the Nation's Land." PLLRC, *One Third of the Nation's Land*, iii (1970). The Congress enacted FLPMA six years later. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 876-77 (1990) (outlining history of public land management and describing PLLRC and subsequent enactment of FLPMA).

silent or ambiguous with respect to the specific issue," *id.* at 843, however, we must next determine the deference, if any, we owe the agency's interpretation of the statute, *United States v. Mead Corp.*, 533 U.S. 218 (2001). If the agency enunciates its interpretation through notice-and-comment rule-making or formal adjudication, we give the agency's interpretation *Chevron* deference. *Id.* at 230-31. That is, we determine whether its interpretation is "permissible" or "reasonable," *Chevron*, 467 U.S. at 843, 844, giving "controlling weight" to the agency's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute," *id.* at 844. On the other hand, if the agency enunciates its interpretation through informal action that lacks the force of law, we accept the agency's interpretation only if it is persuasive. *Mead*, 533 U.S. at 235 (citing *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Section 1714(b) is silent regarding consecutive segregations and, because the IBLA hearing constitutes a formal agency adjudication, we give its interpretation of section 1714(b) *Chevron* II deference.[11] *See, e.g.*, *INS v. Aguirre-Aguirre*, 526

---

[11]Because Mount Royal and the Woods family challenge the IBLA's voiding of their mining claims rather than the Secretary's approval of the second withdrawal petition, we analyze the IBLA's decision in order to discern DOI's interpretation of FLPMA. If instead we analyzed the Secretary's decision to approve the second withdrawal petition and thereby initiate the Second Segregation, however, it would not affect our *Chevron* analysis. While the Secretary's approval does not constitute formal adjudication or notice-and-comment rule-making, it merits *Chevron* deference because the Secretary acted with the force of law. *See Pharm. Research & Mfrs. of Am. v. Thompson*, 362 F.3d 817, 821-22 (D.C. Cir. 2004). "[T]he Congress expressly conferred on the Secretary authority" to approve

U.S. 415, 424-25 (1999). Reviewing under *Chevron* II the IBLA's interpretation of section 1714(b) as authorizing the Secretary to approve consecutive withdrawal petitions with different stated purposes thereby triggering consecutive two-year segregation periods, we believe its interpretation is both "reasonable" and "permissible." Section 1714(b) does not prohibit consecutive withdrawal proposals with different stated purposes. Moreover, contrary to the appellants' argument, permitting such proposals does not undermine FLPMA's two-year cap on segregations. A consecutive withdrawal proposal with a different stated purpose neither renews a pending proposal nor extends a segregation period beyond two years. Rather, it responds to new developments, *e.g.*, the introduction of legislation regarding the tract or the discovery of additional resource uses or values, and, correspondingly, the resulting segregation period gives the Secretary time to evaluate whether the withdrawal should be modified. *See* H.R. Rep. No. 94-1163, at 10 (1976) ("[FLPMA] specifically grants the Secretary the authority, by regulation, to provide procedures (segregation of the lands) for protection of values in lands from nonconforming uses and for other purposes while he is considering their possible withdrawal.").

Next, the appellants argue that because section 1714(d) expressly permits a withdrawal aggregating fewer than 5,000 acres "to preserve [a land] tract for a specific use then under consideration by the Congress" and section 1714(c) does not expressly permit a withdrawal aggregating more than 5,000

---

a withdrawal petition and thereby initiate a segregation period under section 1714(b) and "[t]hrough this express delegation of specific interpretive authority, the Congress manifested its intent that the Secretary's determinations . . . should have the force of law." *Id.* at 822 (internal quotation omitted).

acres for that purpose, a section 1714(c) withdrawal in aid of legislation is unauthorized pursuant to the rule of statutory construction that *expressio unius est exclusio alterius* (the "mention of one thing implies the exclusion of another thing"). *Halverson v. Slater*, 206 F.3d 1205, 1207 (D.C. Cir. 2000) (internal quotations omitted). Unlike subsection (d), however, subsection (c) permits the Congress to veto the Secretary's withdrawal decision with respect to a land tract aggregating 5,000 acres or more irrespective of purpose. Specifically, the Secretary must notify the Congress of the withdrawal and "submit a report addressing the twelve issues set forth in subsection (c)(2)," *New Mexico*, 969 F.2d at 1136 (citing 43 U.S.C. § 1714(c)), including "an analysis of the manner in which existing and potential resource uses are incompatible with or in conflict with the proposed use," 43 U.S.C. § 1714(c)(2)(4). The Congress may then nullify the withdrawal by adopting a concurrent resolution disapproving the Secretary's decision. *Id.* § 1714(c). Because a withdrawal aggregating 5,000 acres or more is subject to congressional oversight, FLPMA permits the Secretary to withdraw such a land tract for any purpose so long as the Congress does not disapprove. *See Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000) ("[I]f there are other reasonable explanations for an omission in a statute, *expressio unius* may not be a useful tool.").

Finally, the IBLA's conclusion that the Second Proposal "was not identical to," *Mount Royal Joint Venture*, 144 IBLA at 281, the First Proposal because the Second Proposal was in fact "in aid of legislation" pursuant to section 1714(c) was neither arbitrary nor capricious. BLM first petitioned to withdraw 19,684.74 acres of public mineral estate for the statutory 20-year maximum to protect the Hills's non-mineral resource uses and values. The Secretary's approval of BLM's withdrawal petition began a two-year segregation period during which DOI was to

take the necessary administrative steps to permit the Secretary to withdraw the tract. As the two-year period was nearing expiration, however, it became apparent the Secretary could not withdraw the land by that date. Congressman Williams, who had been lobbying to protect the Hills's non-mineral resources for at least two years, Letter from Pat Williams to Bruce Babbitt, Secretary of the Interior (June 1, 1993), *reprinted in* JA at 267-68, introduced legislation to permanently prohibit mineral location and entry within the ACEC portion of the Hills. At that point, BLM petitioned for a shorter, two-year withdrawal to maintain "the status quo" in the Hills "pending" the Congress's consideration of a permanent prohibition on mining. 60 Fed. Reg. at 38,853. That is, BLM's Second Proposal differed from its First Proposal—the Second sought to assist the legislative attempt to prohibit mineral location and entry in the Hills permanently rather than to withdraw the Hills for only 20 years. Congressman Williams's introduction of withdrawal legislation promoted FLPMA's purpose by asserting the Congress's power to manage federal lands. In enacting FLPMA, the Congress delegated to the Secretary considerable withdrawal authority, *see* 43 U.S.C. § 1714, but it also reaffirmed its own final authority over the withdrawal of public lands, *see id.* § 1701(a)(4). In the absence of a constitutional challenge, we will not interfere with congressional actions expressly authorized by statute.

Because we affirm the IBLA's decision upholding the Second Segregation, we also affirm its decision declaring the appellants' mining claims null and void *ab initio*. *See Dean Staton*, 136 IBLA 161, 164 (July 25, 1996) ("[M]ining claims located on lands not open to appropriation are null and void ab initio.") (citing *Shiny Rock Mining Corp. v. United States*, 825 F.2d 216, 219 (9th Cir. 1987) ("[A] mining claim is void *ab initio* when it is located on land which at the date of location

was included in an application for withdrawal which has been noted on the land records."")). Accordingly, we affirm the grant of summary judgment to DOI on this claim.

## B. PLO 7254

The Secretary must manage the public lands under "principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'" *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)) (alteration in original). "Sustained yield" requires the Secretary "to control depleting uses over time, so as to ensure a high level of valuable uses in the future." *Id.* (citing 43 U.S.C. § 1702(h)).

Mount Royal and the Woods family argue that the Secretary did not utilize "multiple use" management principles in issuing PLO 7254 and thus his decision was arbitrary and capricious. They contend that DOI had developed an "anti-mining agenda," Appellants' Br. at 41, as early as 1993 and that the decision to issue PLO 7254 was "predetermined," *id.* at 30-34. In support of their argument, the appellants suggest that the First Proposal represented a "complete 'about face,'" *id.* at 31, from previous BLM policy regarding the Hills and that, by proposing a withdrawal that did not conform to the West HiLine Plan,[12] BLM "'put the cart before the horse,'" *id.* at 32, in violation of

---

[12]As noted earlier, under the original West HiLine Plan and the accompanying ROD, mineral location and entry were permitted in the Hills. *See supra* p. 5.

FLPMA and implementing regulations. Mount Royal and the Woods family also contend that the withdrawal violates the Establishment Clause of the First Amendment to the United States Constitution by seeking to protect an area of religious significance to Native Americans at the expense of mineral development.

In attempting to make the First Proposal conform to the West HiLine Plan, BLM drafted the Amendment/EIS utilizing principles of "multiple use management." BLM considered four alternatives for managing the Hills. After analyzing the "pertinent natural resources and economic and social conditions found in the study area," Final Sweet Grass Hills Resource Management Plan Amendment and Environmental Impact Statement 13, *reprinted in* JA at 485, the "environmental, social, and economic consequences of implementing the [four] alternatives," *id.* at 31, JA at 502, and feedback from "interest groups and individuals[,] . . . Federal, state, local agencies and Native American tribes," *id.* at 56, JA at 527, it recommended withdrawing the entire public mineral estate. Subsequently, in its 1997 ROD, BLM approved the "preferred alternative" contained in the Amendment/EIS. JA at 631.

Consistent with BLM's recommendations, the Secretary issued PLO 7254 "to protect unique resources within the Sweet Grass Hills [ACEC] and surrounding areas," including "areas of traditional spiritual importance to Native Americans, habitat which has high potential for reintroduction of the endangered peregrine falcon, seasonally important elk and deer habitat, and aquifers that provide potable water to local residents." Notification to Congress as Required by FLPMA 204(c)(2), Sweet Grass Hills 20-Year Withdrawal 1, *reprinted in* JA at 654. In the statutorily-required "Notification to Congress," the Secretary addressed all twelve factors listed in 43 U.S.C. § 1714(c)(2), explaining in detail the proposed withdrawal's

effects on current natural resource uses in the Hills, *see id.* § 1714(c)(2)(2), its effects on current land users, *see id.* § 1714(c)(2)(3), its "incompatib[ility]" with current land uses, *see id.* § 1714(c)(2)(4), and its effect on state and local government interests and the regional economy, *see id.* § 1714(c)(2)(8). Most important, after receiving the Secretary's notification, the Congress chose not to exercise its reserved power under FLPMA to veto the withdrawal. That is, the Congress did not adopt a concurrent resolution disapproving the withdrawal, *id.* § 1714(c), but instead let it stand.

With respect to the appellants' argument that the decision in PLO 7254 was "predetermined," the record demonstrates that, while the 1988 West HiLine Plan and subsequent draft EIS regarding the Mount Royal/Manhattan Plan recommended allowing mineral location and entry in the Hills, strong public opposition to mining in the wake of the draft EIS's release rather than any BLM "anti-mining agenda" influenced its decision to consider a withdrawal. BLM's 1993 Application for Withdrawal concludes:

> [T]he public was not as cognizant of the significance of the conflict between hardrock mining and the ACEC designation until recently when exploration and possible mining was presented as a reality. Similar activity in other areas of Montana contributed to this public awareness. As a result of these most recent public inputs, local residents, as well as Native Americans, have provided new information concerning the importance of the resource values, particularly cultural and hydrologic.

Petition/Application for Withdrawal of Sweet Grass Hills 12 (July 15, 1993), *reprinted in* JA at 298. Furthermore, the appellants ignore FLPMA's implementing regulations which

expressly allow for the simultaneous issuance of a withdrawal proposal and preparation of a West HiLine Plan amendment to conform to the proposal. *See* 43 C.F.R. § 1610.5-5 ("If the amendment is being considered in response to a specific proposal, the analysis required for the proposal and for the amendment may occur simultaneously.").

Finally, PLO 7254 does not violate the Establishment Clause. Supreme Court precedent makes clear that government action conforms to the Establishment Clause if: (1) the action has a "secular . . . purpose," (2) the "primary effect" of the action "neither advances nor inhibits religion" and (3) the action does "not foster an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (internal citation and quotation omitted). The Secretary enunciated several secular purposes for withdrawing the Hills, including protection of aquifers and the environment. Furthermore, PLO 7254 does not primarily affect religious interests; on the contrary, it protects all non-mineral resources in the Hills. *Id.* Finally, the land order does not foster excessive government entanglement with religion because it neither regulates religious practices nor increases Native American influence over management of the Hills. *See* Appellee's Br. at 46.

In sum, DOI followed FLPMA's land management guidelines in withdrawing 19,685 acres of public mineral estate located in the Hills from mineral location and entry for 20 years and, accordingly, its withdrawal decision contained in PLO 7254 is neither arbitrary nor capricious.

For the foregoing reasons, we affirm the district court's grant of summary judgment to the Department of the Interior.

*So ordered.*