Opinion for the Court filed by Chief Judge SENTELLE.
Dissenting opinion filed by Circuit Judge KAVANAUGH.
SENTELLE, Chief Judge:
In these consolidated cases, Cablevision Systems Corporation and Comcast Corporation petition for review of the Federal Communications Commission’s decision to extend for five years a statutory prohibition against exclusive contracts between cable operators and cable affiliated programming networks. Petitioners assert that the Commission misinterpreted the plain meaning of the underlying statute. In addition, they argue the Commission’s decision was arbitrary and capricious and therefore violates the Administrative Procedure Act (APA). Lastly, petitioners claim the decision fails under First Amendment intermediate scrutiny. We hold that the Commission’s interpretation of its statutory mandate was reasonable. Because we also hold that the Commission’s decision satisfies arbitrary and capricious review, and that intermediate scrutiny is not applicable, we deny the petitions for review.
*1308 I. Background
Multichannel video programming distributors (MVPDs), such as cable television operators or direct broadcast satellite providers, offer customers multiple channels of video programming, generally by subscription. From the 1940s when the first cable television systems were built until the 1990s, the cable industry dominated this market. In most geographic areas, cable operators were the only MVPDs, often enjoying local cable monopolies because they were permitted to enter into exclusive local franchises when they laid cables using public rights of way and easements. As the market for cable subscriptions grew, so did the market for cable programming to supplement television broadcast programming. Cable programmers began to develop programs for sale or license to cable operators. These two halves of the cable industry often had — and still have — overlapping ownership, with cable operators having ownership interests in cable programmers, and vice versa. Such companies constitute “vertically integrated” entities.
In 1990, the Federal Communications Commission reported to Congress that the cable operators’ monopolies in the MVPD market persisted partly because competitors were unable to secure programming owned by vertically integrated cable companies. Competition, Rate Deregulation and the Commission’s Policies Relating to the Provision of Cable Television Service, 5 F.C.C.R. 4962, 5006-08 (1990). In response to the Commission’s report, Congress enacted the Cable Television Consumer Protection and Competition Act of 1992 (Cable Act). Pub.L. No. 102-385,106 Stat. 1460. Section 628 of the Act, 47 U.S.C. § 548, prohibits various activities that inhibit competition in video programming. One provision, § 628(c)(2)(D), directs the Commission to promulgate regulations prohibiting exclusive contracts for cable and broadcast programming between a cable operator and a cable programming vendor in which a cable operator has an attributable interest, unless the Commission determines that the contract would be in the public interest. This provision (“the exclusivity prohibition”) applies to programming delivered to distributors via satellite, the most common method of delivery, but not to programming delivered by terrestrial lines such as fiber optic cables. The exclusivity prohibition was subject to a sunset provision, which provided that the exclusivity prohibition would lapse ten years after the date of the Cable Act’s enactment, “unless the Commission finds, in a proceeding conducted during the last year of such 10-year period, that such prohibition continues to be necessary to preserve and protect competition and diversity in the distribution of video programming.” 47 U.S.C. § 548(c)(5).
At the end of the ten year period, in 2002, the Commission extended the exclusivity prohibition for five years with a commitment to evaluate the market again at the end of the five years. In its analysis, the Commission concluded that the prohibition was “necessary” “if, in the absence of the prohibition, competition and diversity would not be preserved and protected.” Implementation of the Cable Television Consumer Protection and Competition Act of 1992 and Development of Competition and Diversity in Video Programming Distribution: Section 628(c)(5) of the Communications Act — Sunset of Exclusive Contract Prohibition, Report and Order, 17 F.C.C.R. 12,124, 12,128-30 (2002). Though competition in the multichannel video programming market had improved significantly since 1992, the Commission found that conditions had not changed enough to allow the prohibition to sunset.
*1309 Over the next five years, the markets for both multichannel video programming distribution and programming creation continued to change dramatically. When the Commission compiled its report on the state of the MVPD market in 2007, it recorded many differences between the 2002 and 2007 markets. Implementation of the Cable Television Consumer Protection and Competition Act of 1992 and Development of Competition and Diversity in Video Programming Distribution: Section 628(c)(5) of the Communications Act — Sunset of Exclusive Contract Prohibition, Report and Order and Notice of Proposed Rulemaking, 22 F.C.C.R. 17791 (2007) (“2007 Order”). As of 2007, there were 531 national programming networks, up from 294 in 2002 and just 68 in 1992. The percentage of those networks that were vertically integrated decreased to 22 percent from 35 percent in 2002 and 57 percent in 1992. However, many of the most popular networks were still cable affiliated; seven of the Top 20 satellite-delivered networks as ranked by prime time ratings, and almost half of all regional sports networks, were affiliated with the four largest cable operators, Comcast, Time Warner, Cox, and Cablevision.
The cable delivery market also changed significantly. At the time of the Order, cable operators controlled 67 percent of multichannel video programming distribution, down from 78 percent in 2002 and 95 percent in 1992. Direct broadcast satellite operators such as DirecTV and EchoStar served 30 percent of the market, up from 18 percent in 2002. Since 2002, telephone companies have begun offering wireline services based on their telephone infrastructure. While wireline competitors only represent a small share of the MVPD market, they represent a potentially powerful force because they can offer the same bundled voice, broadband data, and video services that cable operators provide but that direct broadcast satellite cannot offer.
To monitor the geographic variations in the television market, the Commission designates geographic television markets, called “designated market areas,” based on local viewing patterns. Each county in the United States is allocated to a market based on which stations receive a preponderance of total viewing hours in the county. 2007 Order at 17,828 n. 276. Examining these designated market areas individually, the Commission noticed that in many areas consumers continue overwhelmingly to subscribe to cable. Cable operators tend to cluster regionally, and over the years smaller operators have consolidated with large operators. Because of this clustering and consolidation, a single geographic area can be highly susceptible to near-monopoly control by a cable company. The four largest cable operators have in fact increased their share of the national MVPD market from 48 percent in 2002 to between 53 and 60 percent in 2007.
In the 2007 Order, the Commission also assessed the incentives of vertically integrated cable companies to withhold programming from competitors. In order to make this evaluation, the Commission extrapolated from exclusive contracts that are allowed to and do exist. See 2007 Order, App’x C, 22 F.C.C.R. at 17,883. Because the exclusivity prohibition only applies to programming delivered to distributors via satellite, vertically integrated cable companies can and do enter into exclusive contracts for programming to be delivered through terrestrial cables. These programming networks tend to be regional, such as Comcast SportsNet Philadelphia or CN8, a Comcast-owned local news and information channel serving 20 television markets. Comcast currently withholds its SportsNet Philadelphia net *1310 work from competitors, and the FCC used this example as a case study to reverse engineer what market conditions make withholding profitable. The Commission then extrapolated from these data to predict how many satellite-delivered regional and national networks would be withheld by vertically integrated cable companies if the prohibition lapsed. Depending on the values for certain variables — including whether subscribers who switch from a competitor sign up for cable service alone or for bundled services such as phone and internet services — somewhere between 26 and 59 market areas would be susceptible to withholding of a regional network owned by Time Warner or Comcast.
For popular national networks, withholding could be profitable for Comcast if as few as 1.9 percent of competitors’ subscribers switched to the affiliated cable operator, assuming ideal conditions for the cable company. However, if the popular national network were owned by Time Warner and new subscribers only bought video services, the required amount of switching might be as high as 63.6 percent of competitors’ customers. Id. at 17,890-91. Given these calculations, the Commission concluded that, at least in some circumstances, vertically integrated cable companies would enter into exclusive contracts for programming if they were allowed to. Though it acknowledged that exclusive contracts sometimes can be beneficial for competition and consumers, the Commission stated that it did not believe “that these purported benefits [would] outweigh the harm to competition and diversity in the video distribution marketplace that would result if we were to lift the exclusive contract prohibition.” Id. at ¶ 63, 22 F.C.C.R. at 17,835. Given its observations of the market and predictions about the effect of lifting the prohibition, the Commission ultimately decided that the prohibition remained necessary under its 2002 Order definition of that term in the sunset provision. The Commission therefore extended the prohibition for another five years with a possibility for an earlier review if the market changed rapidly. Id. at ¶ 1, 22 F.C.C.R. at 17,792.
Petitioners Cablevision and Comcast subsequently filed petitions for this Court to review the 2007 Order.
II. Analysis
A. Standard of Review
The Commission’s interpretation of its statutory mandate must satisfy the two step test under Chevron USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under step one, if a statute “has directly spoken to the precise question at issue,” id. at 842, 104 S.Ct. 2778, the court and the agency “must give effect to the unambiguously expressed intent of Congress,” id. at 843, 104 S.Ct. 2778. Under step two, when the statute is silent or ambiguous, the court asks “whether the agency’s answer is based on a permissible construction of the statute.” Id.
We review the Commission’s decisionmaking process under the Administrative Procedure Act. 5 U.S.C. § 706. We will vacate an agency’s decision as arbitrary and capricious “if [its] factual determinations lack substantial evidence,” Pan-Alberta Gas, Ltd. v. F.E.R.C., 251 F.3d 173, 176 (D.C.Cir.2001), or if the agency “relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,” Mount Royal Joint Venture v. Kempthome, 477 F.3d 745, 753 (D.C.Cir.2007) *1311 (quoting Motor Vehicle Mfrs. Ass’n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). However, we will not substitute our judgment for the agency’s, especially when, as here, the decision under review requires expert policy judgment of a technical, complex, and dynamic subject. See Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 1002-03, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).
Petitioners argue that we must also evaluate the 2007 Order under First Amendment intermediate scrutiny because, they contend, forcing a company to share programming it owns or creates discourages and impedes free speech. The First Amendment standard would require the Commission’s decision to draw “reasonable inferences based on substantial evidence,” Turner Broad. Sys., Inc. v. F.C. C, 512 U.S. 622, 666, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (plurality). Under intermediate scrutiny, the Commission’s findings of fact would not warrant the same degree of deference as under the APA alone. The government would need to show that its restriction of speech is narrowly tailored to an important governmental interest, rather than rely on the deference we generally afford agencies. See United States v. Doe, 968 F.2d 86, 90 (D.C.Cir.1992) (“Where constitutionally protected activity is implicated, we cannot simply defer to the [agency].... ”).
This Court analyzed the exclusivity prohibition under First Amendment intermediate scrutiny once before. In Time Warner Entertainment Co., L.P. v. F.C.C., 93 F.3d 957 (D.C.Cir.1996), we considered a facial challenge to the constitutionality of several parts of the Cable Act, including the exclusivity provision. In deciding what level of scrutiny to apply, we looked to the Supreme Court’s decision in Turner Broadcasting System, which held that rules requiring cable systems to carry certain local commercial television stations and noncommercial education stations were subject to intermediate scrutiny. 512 U.S. at 643, 114 S.Ct. 2445. Applying the Turner Court’s logic to the exclusivity provision, we held that the rule is “likewise ‘justified by special characteristics’ of the affected companies: both ‘the bottleneck monopoly power exercised by cable operators,’ and the unique power that vertically integrated companies have in the cable market.” Time Warner, 93 F.3d at 978 (quoting Turner, 512 U.S. at 661, 114 S.Ct. 2445) (citations omitted). We therefore held intermediate scrutiny to be the appropriate standard to apply, noting that the provision is content-neutral on its face because it “regulat[es] cable programmers and operators on the basis of the ‘economics of ownership,’ a characteristic unrelated to the content of speech.” Id. at 977 (quoting Daniels Cablevision, Inc. v. United States, 835 F.Supp. 1, 7 (D.D.C.1993)). Under intermediate scrutiny, a court must uphold a statutory provision if “it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.” Id. (quoting United States v. O’Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). Applying that standard, we held the exclusivity prohibition to be facially constitutional. Id. at 979.
Because it addressed only a facial challenge to the provision, Time Warner left open the possibility of a future as-applied challenge. However, petitioners here do not actually present that challenge. Instead, they merely invoke the terminology of First Amendment scrutiny in passing, and hope that we find the exclusivity pro *1312 hibition’s burden on MVPDs so heavy and so unnecessary that an as-applied challenge appears on its own. We refuse to manufacture an as-applied challenge for the petitioners, and therefore are left with only a facial challenge. For that issue, we simply refer to our decision in Time Warner. We therefore find it unnecessary to evaluate the 2007 Order under the intermediate scrutiny standard.
Our dissenting colleague is able to tease out references to the First Amendment from petitioners’ arguments. See Dissenting Op. at 1316-18. Notwithstanding these mentions of the Amendment, petitioners fail to make a specific, as-applied challenge that distinguishes their current arguments from the ones we already rejected in the facial challenge in Time Warner. In this case, in providing the required Statement of Issues in its brief, petitioners set forth the following:
I. Whether the FCC misapprehended the standard governing the circumstances under which it may prevent the exclusivity rule from sunsetting.
II. Whether, under the correct standard, the FCC was required to allow the exclusivity rule to sunset.
III. Whether the FCC erred in refusing to narrow the exclusivity rule.
IV. Whether the order under review should be vacated.
Pet. Br. at 3. Conspicuously, petitioners’ recitation of the issues before the court makes no mention of constitutionality. “Federal courts should not decide constitutional questions unless it is necessary to do so,” Kalka v. Hawk, 215 F.3d 90 (D.C.Cir.2000) (citing Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)), nor should they “decide [a] constitutional question unless it is ‘presented with the clarity needed for effective adjudication,’” U.S. v. Byers, 740 F.2d 1104, 1128 (D.C.Cir.1984) (quoting Socialist Labor Party v. Gilligan, 406 U.S. 583, 587 n. 2, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972)). It is hardly necessary for us to decide an issue of constitutionality which petitioner does not even set forth as an issue in the case and to which it refers only obliquely.
B. Merits
Petitioners object to three conclusions made by the Commission in reaching its decision to prolong the exclusivity prohibition. First, the Commission decided to continue to use its 2002 interpretation of the proper standard of review dictated by the statutory sunset clause. Second, the Commission concluded that cable companies would most likely enter into competition-hindering exclusive contracts if allowed to do so. The Commission came to this conclusion using calculations extrapolated from information about existing exclusive contracts for non-satellite delivered programming. Finally, the Commission considered and decided against changing the scope of the prohibition to allow certain types of currently prohibited exclusive contracts.

i. Statutory Interpretation

As noted above, the sunset provision of the Cable Act dictates that the exclusivity prohibition shall cease “unless the Commission finds ... that such prohibition continues to be necessary to preserve and protect competition and diversity in the distribution of video programming.” 47 U.S.C. § 548(c)(5). Petitioners first argue that the 2007 Order applied the wrong definition of “necessary.” The term, however, “is not language of plain meaning.” Cellco P’ship v. F.C.C., 357 F.3d 88, 97 (D.C.Cir.2004). Depending on context, the term can mean anything from “useful” or “conve *1313 nient” to “indispensable” or “essential.” The statutory language of the sunset provision gives little guidance on which definition is most appropriate. Here, the Commission decided to use the same interpretation it used in 2002: the prohibition continues to be necessary “if, in the absence of the prohibition, competition and diversity in the distribution of video programming would not be preserved and protected.” 2007 Order at ¶ 13, 22 F.C.C.R. at 17,801. This interpretation is well within the Commission’s discretion to interpret statutory language under Chevron.
Petitioners also argue that the 2007 Order misinterprets the mandate to preserve and protect competition as a requirement to protect competitors, analogizing the Commission’s current analysis to its faulty analysis vacated in AT & T Corporation v. Iowa Utilities Board, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). In that case, the statutory language at issue required telephone companies to share their networks with competitors whenever failure to do so would “impair” competitors’ ability to provide service. The Commission interpreted the provision to require sharing whenever a failure to share would result in any increase in cost, decrease in quality, or delay to providing services. The Supreme Court held this interpretation invalid because the statute clearly envisioned that some sharing would not be required, but the Commission’s interpretation would result in requiring any and all sharing that would be at all useful to competitors. However, the order before us is easily distinguishable from the one reviewed in Iowa Utilities Board. There, the Commission explicitly stated a standard that equated impairing competitors with any lack of sharing. Here, the Commission’s order discusses harm to consumers and competition that results from harm to competitors, rather than incorrectly believing one harm to be equivalent to the other. See, e.g., 2007 Order ¶ 40, 22 F.C.C.R. at 17,819 (explaining that withholding programming from rivals can significantly impact subscribership, which can “in turn, predictably harm competition and diversity in the distribution of video programming, to the detriment of consumers” (emphasis added)); id. at ¶ 53, 22 F.C.C.R. at 17,829 (“In the long term, a withholding strategy may result in a reduction in competition ..., thereby allowing the affiliated cable operator to raise rates.”). While the Order does often measure effects on MVPDs rather than directly measuring consumer effects, the Commission sufficiently linked the two to justify its conclusion that market conditions do not yet warrant letting the exclusivity prohibition lapse. We trust that the Commission was sincere when it explicitly anticipated that a market may develop in which exclusive programming could exist but not be harmful to competition, and “caution[ed] competitive MVPDs to take any steps they deem appropriate to prepare for the eventual sunset of the prohibition.” 2007 Order at ¶ 29, 22 F.C.C.R. at 17,810.

ii. Decisionmaking Process

Petitioners’ second contention is that the Commission did not rely on substantial evidence when it concluded that vertically integrated cable companies would enter into competition-harming exclusive contracts if the exclusivity prohibition were allowed to lapse. Noting that conclusions based on FCC’s predictive judgment and technical analysis are just the type of conclusions that warrant deference from this Court, we disagree with petitioners’ characterization of the 2007 Order.
It is true that the MVPD market has transformed substantially since the Cable *1314 Act was enacted in 1992. However, as described above, the transformation presents a mixed picture. While cable no longer controls 95 percent of the MVPD market, as it did in 1992, cable still controls two thirds of the market nationally. In designated market areas in which a single cable company controls a clustered region, market penetration of competitive MVPDs is even lower than nationwide rates. 2007 Order at ¶ 55, 22 P.C.C.R. at 17,830.
The amount and diversity of programming has expanded rapidly, giving MVPDs more programming options even if one network were unavailable to them because of an exclusive contract. However, the four largest cable operators are still vertically integrated with six of the top 20 national networks, some of the most popular premium networks, and almost half of all regional sports networks. The Commission believes the ability and incentive for vertically integrated cable companies to withhold “must-have” programming remains substantial enough to require the further extension of the exclusivity prohibition. We must defer to the Commission’s analysis.
It is also true that the Commission’s calculations on the likelihood of future withholding appear susceptible to questions about their predictive power. What is true about Comcast SportsNet Philadelphia may not be equally true for all regional networks and even less true for national networks, yet the Commission still used that one station as the basis for much of its analysis. But predictive calculations are a murky science in the best of circumstances, and the Commission naturally has no access to infallible data about the nature of contracts that do not exist. “[W]e do not sit as a panel of referees on a professional economic journal, but as a panel of generalist judges obliged to defer to a reasonable judgment by an agency acting pursuant to congressionally delegated authority.” City of Los Angeles v. U.S. Dep’t of Trnnsp., 165 F.3d 972, 977 (D.C.Cir.1999). The Commission has recognized and analyzed complicated pictures of the MVPD market both current and projected. These data qualify as substantial evidence for arbitrary and capricious review. The Commission’s decision does not run counter to the evidence, nor is it implausible or irrational. See Mount Royal Joint Venture, 477 F.3d at 753; Center for Auto Safety v. Peck, 751 F.2d 1336, 1373 (D.C.Cir.1985). In short, it is not arbitrary and capricious.
We anticipate that cable’s dominance in the MVPD market will have diminished still more by the time the Commission next reviews the prohibition, and expect that at that time the Commission will weigh heavily Congress’s intention that the exclusive contract prohibition will eventually sunset. Petitioners are correct in pointing out that the MVPD market has changed drastically since 1992. We expect that if the market continues to evolve at such a rapid pace, the Commission will soon be able to conclude that the exclusivity prohibition is no longer necessary to preserve and protect competition and diversity in the distribution of video programming.
Petitioners’ last criticism of the 2007 Order is that the Order failed to narrow the exclusivity rule to apply only to certain types of cable companies or certain types of programming. While the current rule includes a procedure for obtaining an exemption from the prohibition on a case by case basis, petitioners claim that this procedure is not sufficient to save the rule from being invalid because it still prohibits more exclusive contracts than is absolutely necessary to preserve and protect competition and diversity in the market. During the notice and comment period for the 2007 Order, petitioners offered several *1315 suggestions for narrowing the rule, each of which the Commission rejected. It was not arbitrary and capricious for the Commission to reject these suggestions and decide instead to adhere to Congress’s statutory design. Because we hold that the Commission was reasonable in its conclusion that the prohibition — in its original form — continues to be necessary, we also hold that the Commission was reasonable to keep the same prohibition in that same form.
For the reasons set forth above, the petitions for review are Denied.
KAVANAUGH, Circuit Judge,