Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 15, 2008        Decided October 31, 2008

No. 08-1045

C-SPAN, ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS

ASSOCIATION FOR MAXIMUM SERVICE TELEVISION, INC.
AND NATIONAL ASSOCIATION OF BROADCASTERS,
INTERVENORS

———

On Petition for Review of an Order
of the Federal Communications Commission

———

*Bruce D. Sokler* argued the cause for petitioners. With him on the briefs was *Robert G. Kidwell*.

*Burt A. Braverman* was on the brief for *amici curiae* Africa Channel, et al. in support of petitioner.

*Joseph R. Palmore*, Deputy General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Thomas O. Barnett*, Assistant Attorney General, U.S. Department of Justice, *Catherine G. O'Sullivan* and *Nancy C. Garrison*, Attorneys, *Matthew B. Berry*, General Counsel, Federal Communications Commission, *Daniel M. Armstrong*, Associate General Counsel, and *Joel Marcus*, Counsel. *C. Grey Pash Jr.*, Counsel, entered an appearance.

*Jack N. Goodman* argued the cause for intervenors Association for Maximum Service Television, Inc., et al. in support of respondent. With him on the brief were *John A. Rogovin*, *Jane E. Mago*, *Jerianne Timmerman*, and *David L. Donovan*. *Dileep S. Srihari* entered an appearance.

Before: ROGERS, TATEL and KAVANAUGH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: In connection with the congressionally mandated switch from analog to digital broadcast television transmission on February 19, 2009, the Federal Communications Commission promulgated regulations requiring cable systems with analog-only subscribers either to transmit, for three years after the date of transition, both analog and digital signals of must-carry broadcast channels, or to switch to an all-digital system. *Carriage of Digital Television Broadcast Signals*, Third Report and Order, 22 F.C.C.R. 21064 (2007) ("*Viewability Order*"). Various cable programmers challenge the regulations on statutory and constitutional grounds. Because petitioners have not met their heavy burden as non-regulated parties to show that they have Article III standing, we must dismiss the petition.

**I.**

Under the Communications Act, cable operators with twelve or more channels are required to devote up to one third of their "usable activated channels" to "the signals of local commercial [broadcast] television stations." 47 U.S.C. § 534(b)(1)(B). The Act further provides that:

> Signals carried in fulfillment of the requirements of this section *shall be provided* to every subscriber of a cable system. Such signals *shall be viewable* via cable on all television receivers of a subscriber which are connected to a cable system by a cable operator or for which a cable operator provides a connection. If a cable operator authorizes subscribers to install additional receiver connections, but does not provide the subscriber with such connections, or with the equipment and materials for such connections, the operator shall . . . offer to sell or lease . . . a converter box to such subscribers at [regulated] rates.

*Id*. § 534(b)(7) (emphasis added). With regard to non-commercial broadcast stations, the Act mandates that "each cable operator of a cable system shall carry the signals of qualified noncommercial educational television stations," *id*. § 535(a), and that such signals "shall be available to every subscriber as part of the . . . lowest priced service tier that includes the retransmission of local commercial television broadcast signals," *id*. § 535(h). The commercial and non-commercial transmissions that cable systems are required to transmit are "must-carry" broadcast signals. The constitutionality of the Act was upheld in *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997) ("*Turner II*"), and is not at issue here.

Under the Digital Television Transition and Public Safety Act of 2005,[1] full power television stations, a category that includes certain local commercial and noncommercial stations, are required to switch their broadcast transmissions from analog to digital format by February 18, 2009. The requirement that broadcast television stations switch to all-digital signals does not, however, extend to cable systems. These are generally free to choose their own mix of analog and digital technology. However, pursuant to 47 U.S.C. §§ 534(b)(4)(A), 535(g)(2), which prohibit "material degradation" of the signals of must-carry stations, the Commission has required cable operators to transmit in high-definition ("HD")[2] any signals delivered to them in HD by must-carry stations. *Carriage of Digital Television Broadcast Signals*, First Report and Order, 16 F.C.C.R. 2598, 2629-31 (2001). As millions of cable customers lack the equipment required to view digital cable transmissions, these analog cable consumers would be unable to view local broadcast stations transmitted in digital format only.

On May 4, 2007, responding to the prospect that some local broadcast stations might not be available to analog cable subscribers, the Commission issued a Notice of Proposed Rulemaking ("NPRM") "seek[ing] comment on the post-transition obligations of cable operators." *Carriage of Digital Television Broadcast Signals*, NPRM, 22 F.C.C.R. 8803, 8803. After receiving comments, the Commission, on November 30, 2007, issued the *Viewability Order* in which the Commission adopted rules  establishing a "viewability mandate," requiring

---

[1] *See* Deficit Reduction Act of 2005, Title III, Pub. L. No. 109-171, 120 Stat. 4, 21 (2006) (codified at 47 U.S.C. § 309 (2006)).

[2] The Commission divides digital displays into two groups based on resolution quality and aspect ratio: HD and Standard-Definition ("SD").

that "to the extent that [cable] subscribers do not have the capability of viewing digital signals, cable systems must carry the signals of commercial and non-commercial must-carry stations in analog format to those subscribers, after downconverting the signals from their original digital format." *Viewability Order*, 22 F.C.C.R. at 21071. Under separate regulations promulgated in 2001 regarding material degradation, 47 U.S.C. §§ 534(b)(4)(A), 535(g)(2), where a must-carry broadcaster delivers its signal to a cable operator in HD digital format (as opposed to SD), the cable operator is required to transmit the must-carry station in HD.[3] Thus, the combined effect of the material degradation regulations and the *Viewability Order* is that cable systems with analog and digital subscribers ("hybrid systems") are effectively required to allocate two channels to each must-carry HD broadcaster. Alternatively, cable systems are permitted to become all-digital, with all subscribers able to view digital signals; under this option, only digital must-carry signals need be broadcast. The Commission specified that "any downconversion costs will be borne by the [cable] operator," 22 F.C.C.R. at 21072, and further provided that the viewability mandate would apply for an initial three-year period following the February 2009 digital transition date.

The Commission, as relevant, found that "any incremental increase of bandwidth devoted to must-carry stations [would] be negligible," 22 F.C.C.R. at 21076 (internal quotations omitted), and that any concerns of individual cable channels about being crowded out of cable systems were outweighed by Congressional concern for broadcast channels. It further noted

---

[3] *Carriage of Digital Television Broadcast Signals*, First Report and Order and Further Notice of Proposed Rulemaking, 16 F.C.C.R. 2598 ¶ 73 (2001). See also *Carriage of Digital Television Broadcast Signals*, Fourth Report and Order, FCC 08-193, 2008 WL 4092895 (Sept. 4, 2008), discussed *infra*.

that insofar as its requirements spurred a move to all-digital cable systems, total channel capacity might actually be increased. In concluding that the viewability provisions survived intermediate First Amendment scrutiny, the Commission noted that the all-digital option for cable systems was "significantly less burdensome than the analog must-carry mandate upheld by the Supreme Court in [*Turner II*] because digital signals occupy much less bandwidth on a cable system than do analog signals." *Id*. at 21085. Finally, the Commission underscored that its viewability provisions were "in line with the approach already voluntarily planned by many cable operators." *Id*. at 21071.

## II.

The cable operators themselves have not challenged the *Viewability Order*. Instead, petitioners are cable programmers who fear that access to cable operators' systems will become more difficult because of the viewability mandate. They contend that the requirements of the *Viewability Order* are contrary to the plain meaning of the Communications Act, are arbitrary and capricious, and violate their First Amendment rights. While the court would consider the familiar standard set out in *Chevron U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 837 (1984), in reviewing an agency's interpretation of a statute that it is required to implement, and review *de novo* a challenge to the constitutionality of the regulations, *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004), the Commission has raised a threshold challenge to petitioners' standing under Article III of the Constitution.

Article III standing is reviewed under the standard established by *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), and contains three elements. In order to establish standing, a party must have suffered an injury-in-fact, by

showing "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotations and citations omitted). In addition, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (internal quotations and alterations omitted). Finally, it "must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. at 561 (internal quotations omitted). "[W]hen the [petitioner] is not [itself] the object of the government action or inaction [petitioner] challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Id*. at 562 (internal quotations omitted). In this latter situation "it becomes the burden of the [petitioner] to adduce facts showing that . . . choices [by parties directly affected by a regulation] have been or will be made in such manner as to produce causation and permit redressability of injury." *Id*.

Petitioners' theory of standing is that by requiring increases in the percentage of bandwidth devoted by hybrid cable systems to must-carry channels, the *Viewability Order* ensures that hybrid cable systems will have less bandwidth to devote to other uses, including cable programming. This increases the competitive pressure faced by cable programmers as they attempt to sell their wares to cable systems, which have less bandwidth to fill and can thus afford to drive harder bargains with potential suppliers. In addition to immediate economic injuries, they offer that the *Viewability Order* interferes with their speech by removing further channel capacity from market competition. While numerous factors affect cable systems' decisions about bandwidth allocation, available space is an absolute constraint. In the face of this limitation, purveyors of cable content will face greater competitive pressures, and even if the amount of content they provide does not change, the terms

on which they provide the content have the concrete possibility of becoming worse. By definition, ending the directed allocation of a portion of cable systems' bandwidth will alleviate this competitive impediment. While the cable industry itself may well have made promises concerning carriage of broadcast channels, petitioners contend, in effect, that removing government compulsion from the equation opens up the possibility that a particularly compelling cable content offering for the "last slice of bandwidth" could convince individual cable systems to abandon dual carriage of at least some broadcast networks.

Petitioners rely on two court cases in support of their theory of standing. In *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 637 (1994) ("*Turner I*"), the Supreme Court, in discussing mandatory carriage requirements generally, held that these requirements regulate cable speech by "render[ing] it more difficult for cable programmers to compete for carriage on the limited channels remaining" after implementation of must-carry requirements. *See also id.* at 645. In *Quincy Cable TV, Inc. v. FCC* ("*Quincy Cable*"), 768 F.2d 1434, 1445 n.24 (D.C. Cir. 1985), this court expressly held that cable programmers had standing to challenge the Commission's must-carry rules. However neither *Turner I* nor *Quincy Cable* stand for the proposition that cable programmers will always have standing to challenge must-carry rules, as petitioners appear to suggest. In *Quincy Cable*, the primary basis for this court's conclusion of standing was a statement by cable systems that the must-carry rules at issue would preclude carriage of at least one cable programming petitioner that otherwise would have been carried.[4] 768 F.2d at 1445 n.24. The opposite type of

---

[4] *Quincy Cable* also suggested that "a plaintiff who has been entirely deprived of any opportunity to compete has standing to challenge the constitutionality of that deprivation." 768 F.2d at 1445

statements exist in the present record, for cable operators have publically stated through their association that they will, in any event, voluntarily do what the *Viewability Order* requires.[5] And unlike in *Quincy Cable*, there is no indication in the record that any cable operator that otherwise would have carried one of petitioners' cable programs will not do so because of the *Viewability Order*. In *Turner I*, the Supreme Court noted that the must-carry statute burdened cable programmers' speech "by reducing the number of channels for which they can compete," 512 U.S. at 645, but did not conduct an analysis of programmers' standing.

Petitioners' claim of standing, based on the assertion that the *Viewability Order* necessarily means that they will suffer a

---

n.24 (citing *Regents of Univ. of. California v. Bakke*, 438 U.S. 265, 280-82 n.14 (1978)). Petitioners do not allege that they have been "entirely deprived" of "any" opportunity to compete, only that it is "more difficult" for them to compete. Pet'rs' Reply Br. at 4-5 (citing *Turner I*, 512 U.S. at 636-37 and *Turner II*, 520 U.S. at 214).

[5] *See* Ted Hearn, *NCTA Keeping Three-Year Dual Carriage Vow: Operators Will Keep Promise Even if Court Challenge to FCC Succeeds*, MULTI-CHANNEL NEWS, Feb. 5, 2008 (Resps.' Br. Appx.); statement of Kyle McSlarrow, NCTA President and CEO, *The Status of the DTV Transition: 370 Days and Counting* to the Subcomm. on Telecomms. and the Internet of the H. Comm. on Energy and Commerce, 110th Cong. 2-3 (2008), *available at* http://energycommerce.house.gov/cmte_mtgs/110-ti-hrg.021308.McSlarrow-testimony.pdf; statement of Glen Britt, President and CEO of Time Warner Cable, on *The Status of the Digital Television Transition,* before the Subcomm. on Telecomms. and the Internet of the H. Comm. on Energy and Commerce, 110th Cong. 5 (2007), *available at* http://energycommerce.house.gov/cmte_mtgs/110-ti-hrg.032807.Britt-testimony.pdf . The NCTA represents cable operators serving more than ninety percent of cable households.

First Amendment injury-in-fact as a result of less bandwidth being available, falters. As petitioners' asserted injury arises from an allegedly unlawful regulation of others, under *Lujan* they cannot meet their burden merely by virtue of their status as programmers. Rather, the petitioners must "adduce facts showing," *Lujan*, 504 U.S. at 562, that the challenged regulation will likely cause a concrete and imminent First Amendment injury to at least one of them, and that a favorable decision by this court would redress that injury. While petitioners ask the court to assume that the *Viewability Order* will burden their speech, the causal connection between the *Viewability Order* and the claimed injury is tenuous at best.

Given cable operators' pledge to follow the *Viewability Order* whether or not it is upheld by the court, *supra* n.5, petitioners' proof of causation must rest on facts showing that at least one petitioner competes for carriage on a cable system that is a hybrid system bound by the *Viewability Order*, that will not opt to switch to all-digital operations, that receives HD (as opposed to SD) signals from must-carry stations, and that will not voluntarily follow the *Viewability Order* anyway but is operating at "full" capacity. Petitioners would then have to show that the burden to them resulting from a decrease in channel capacity for that cable operator will not be alleviated by increases in capacity across cable systems as a result of the incentives in the *Viewability Order* to go all-digital. *See generally Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668-72 (D.C. Cir. 1996) (en banc). As the record before this court stands, petitioners have "failed to show how carriage of a handful of must-carry channels would have any impact on cable operators' programming choices." Intervenors' Br. at 16.

To begin, the Commission found that "many [cable operators] already have" chosen to operate or transition to all

digital systems, 22 F.C.C.R. at 21072,[6] and cited record evidence suggesting that "virtually *all* cable operators ultimately *will* do so," *id.* (quoting reply comments of National Association of Broadcasters ("NAB") and Maximum Service Television ("MSTV") at 5) (emphasis in original). Petitioners do not dispute that digital technology frees up bandwidth creating additional capacity usable for programming. *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 293-94 (D.C. Cir. 2003). Comments in the rulemaking record referred to a study of cable infrastructure projecting further expansion of capacity, and the Commission observed that the *Viewability Order*, in providing an incentive for cable systems to become all digital (to avoid down-converting digital broadcast signals to analog), could have a positive impact on petitioners by opening additional capacity usable for programming. The Commission also pointed to comments suggesting that the *Viewability Order* is unlikely to have an impact on the carriage of most stations because the "vast majority of broadcasters opt for retransmission consent," 22 F.C.C.R. at 21076 (quoting comments of Time Warner), and that "any incremental increase of bandwidth devoted to must-carry stations will be 'negligible,'" *id.* (quoting reply of the NAB). Petitioners' reliance on the Commission's previous statements[7] that a duplicative carriage regime in aid of digital transition would burden programmer speech by decreasing the number of already limited channels for which they can compete for carriage appears not to acknowledge either that the *Viewability Order* affords an incentivized alternative – full

---

[6] *See Consolidated Requests for Waiver*, 22 F.C.C.R. 11780, 11806 (Media Bureau 2007).

[7] *See* NPRM, 13 F.C.C.R. 15092 ¶ 39 (1998); First Report and Order and Further NPRM, 16 F.C.C.R. 2598 ¶ 9 (2001); Second Report and Order and First Order on Reconsideration, 20 F.C.C.R. 4516 ¶ 22 (2005).

digital, which frees up bandwidth – or that the particularity of injury to these petitioners is missing.  As a result, the Commission observes on appeal, "unlike [in] *Quincy Cable*, there is no evidence (and it is very unlikely) that cable systems with hundreds of channels are 'saturated' with must-carry stations that deprive petitioners  'any opportunity at all' to secure a channel slot." Resps.' Br. at 30 (quoting *Quincy Cable*, 768 F.2d at 1445).

Additionally, the Commission has since narrowed the scope of the *Viewability Order*.  On September 4, 2008, the Commission ruled that small cable systems (i.e., unaffiliated systems with 2,500 or fewer subscribers or with an activated channel capacity of 552 MHz or less) are not obligated to transmit must-carry stations in HD and that all cable operators, regardless of size, need only transmit must-carry stations in digital when those stations deliver their signal in HD, or when digital customers would otherwise be unable to view analog signals.  *Carriage of Digial Television Broadcast Signals*, Fourth Report and Order, FCC 08-193, 2008 WL 4092895 (Sept. 4, 2008); *supra* n.3.  Moreover, it is unclear whether every cable system uses all of its allocated bandwidth.  While petitioners note in their brief that an extremely large number of cable channels compete for space on networks that generally have many fewer channel slots than there are channels, this is not necessarily a perfect proxy for full use of bandwidth.  When pressed during oral argument, petitioners were unable to point to any cable system using its full bandwidth, asserting instead that it is clear that there are far more speakers than capacity.

Finally, judged against *Quincy Cable,* petitioners' theory of redressability is exceedingly vague.  Cable operators have stated that they will ensure viewability regardless of our decision here.  Moreover, because cable operators do have significant choice in allocating their bandwidth capacity between different uses (e.g.,

pay-per-view, various content providers, telephone services, etc.), it is unclear whether these petitioners will or will not be offered channel space as a result of the *Viewability Order*. Petitioners offer no particularized information in this regard. It is unclear, in other words, whether any cable operator that otherwise would have offered these cable programmer petitioners channel space will deny them channel space because of the *Viewability Order*. Petitioners fail to "adduce facts showing," *Lujan*, 504 U.S. at 562, that reversal of the *Viewability Order* would result in additional capacity for which they compete and thus redressability, like causation, remains speculative.

Accordingly, we must dismiss the petition for review for lack of Article III standing and we do not reach the merits of petitioners' challenges to the *Viewability Order*.