# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 27, 2013      Decided December 27, 2013

No. 12-1334

AGAPE CHURCH, INC., ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

NATIONAL HISPANIC MEDIA COALITION, ET AL.,
INTERVENORS

———

On Petition for Review of an Order of
the Federal Communications Commission

———

    *William S. Consovoy* argued the cause for Petitioners. On the briefs were *Helgi C. Walker*, *Kathleen A. Kirby*, *Eve Klindera Reed*, and *Christiane M. McKnight*. *Jane E. Mago* and *Jerianne Timmerman* entered appearances.

    *Andrew Jay Schwartzman* argued the cause and filed the brief for intervenor National Hispanic Media Coalition.

    *Joel Marcus*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *William J. Baer*, Assistant Attorney General,

and *Robert B. Nicholson* and *Kristen C. Limarzi*, Attorneys, U.S. Department of Justice; *Sean A. Lev*, General Counsel, *Peter Karanjia*, Deputy General Counsel, and *Jacob M. Lewis*, Associate General Counsel, Federal Communications Commission. *Richard K. Welch*, Deputy Associate General Counsel, and *Laurence N. Bourne*, Counsel, Federal Communications Commission, entered appearances.

*Matthew A. Brill* argued the cause for intervenors National Cable & Telecommunications Association and Time Warner Cable, Incorporated. With him on the brief were *Richard P. Bress*, *Amanda E. Potter*, *Katherine I. Twomey*, *Rick C. Chessen*, *Michael S. Schooler*, and *Diane B. Burstein*.

Before: KAVANAUGH, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

EDWARDS, *Senior Circuit Judge*: In the Cable Television Consumer Protection and Competition Act of 1992 (the "Cable Act"), Congress enacted provisions requiring cable television systems to dedicate some of their channels to local broadcast stations, creating so-called "must-carry" rights for stations electing such mandatory carriage. *See* 47 U.S.C. §§ 534-35. Section 614(b)(7), the principal statutory provision at issue in this case, states that must-carry broadcast signals "shall be viewable via cable on all television receivers of a subscriber which are connected to a cable system by a cable operator or for which a cable operator provides a connection." 47 U.S.C. § 534(b)(7).

In 2007, with the growing prominence of digital broadcasting, the Federal Communications Commission ("FCC" or "Commission") promulgated a rule requiring "hybrid" cable companies – *i.e.*, those that provide both analog and digital cable service – to "downconvert" from digital to analog broadcast signals from must-carry stations for subscribers with analog television sets. *Carriage of Digital Television Broadcast Signals*, Third Report and Order, 22 FCC Rcd. 21,064 (2007) ("Viewability Rule"). This downconversion requirement ensured that digital broadcast programs from protected must-carry stations would be converted by the cable companies from digital to analog signals *before* transmission to customers. In other words, cable subscribers with analog television sets would be able to view the digital programs from must-carry broadcast stations without the need of special equipment. By its terms, the Viewability Rule was scheduled to expire in 2012, unless extended by the Commission.

In 2012, following notice and comment rulemaking, the FCC allowed the downconversion requirement to expire. In place of the Viewability Rule, the Commission promulgated a new rule that allows cable operators to provide conversion equipment to analog customers, either "for free or at an affordable cost that does not substantially deter use of the equipment." *Carriage of Digital Television Broadcast Signals*, Fifth Report and Order, 27 FCC Rcd. 6529, 6534 (2012) ("Sunset Order"). Petitioners, a group of must-carry broadcasters, now seek review of the Sunset Order. Petitioners claim that the FCC's new rule cannot be squared with Congress's mandate that must-carry broadcast signals "*shall be viewable* via cable on all television receivers of a subscriber which are connected to a cable system." 47 U.S.C. § 534(b)(7) (emphasis added).

Petitioners have advanced four claims in support of their petition for review.

- First, Petitioners contend that the Commission's new rule violates the plain terms of the statute and, thus, cannot survive review under *Chevron* Step One. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("The judiciary . . . must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." (citations omitted)).

- Second, Petitioners essentially assert that the new rule is manifestly contrary to the statute and, therefore, cannot survive scrutiny under *Chevron* Step Two. *Id*. at 843-44.

- Third, Petitioners claim that the FCC's new rule is not supported by reasoned decisionmaking and, therefore, is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

- Finally, Petitioners argue that the FCC's notice and comment rulemaking procedures were fatally flawed

because the agency's Sunset Rule was not a logical outgrowth of the agency's notice of proposed rulemaking. *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) ("[A] final rule fails the logical outgrowth test and thus violates the APA's notice requirement where interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." (quotation and citation omitted)).

Petitioners' claims lack merit. The FCC's 2007 Viewability Rule was not mandated by the statute. Rather, the rule was promulgated by the Commission as a stopgap measure to preserve access to must-carry broadcast programs for the significant number of cable customers with analog television sets. Since 2007, however, the telecommunications market – including the technology in use by broadcasters, cable distributors, and customers – has changed dramatically. The congressionally mandated transition from analog to digital broadcasting is complete, nearly all new televisions on the market are digital-ready, and many cable companies have abandoned analog service altogether in favor of all-digital operations. And, most critically, in 2012 there were significantly more home conversion devices in use (27 million) to display digital channels on analog sets than there were customers actually subscribing to analog cable service with downconversion (12.6 million). Petitioners do not dispute that these trends are expected to continue. Rather, Petitioners take the position that the Cable Act *requires* the FCC to maintain the regulatory scheme embodied in the Viewability Rule so long as there are hybrid cable companies providing service to subscribers who use analog television sets. Petitioners' argument effectively freezes time in the face of shifting technology and finds no support in the law.

The FCC's new rule allowing cable operators to offer analog subscribers equipment in lieu of downconversion was within its authority under the statute, supported by reasoned decisionmaking, and properly promulgated pursuant to notice and comment rulemaking procedures in which interested parties should have anticipated that the change was possible. We therefore deny the petition for review.

## I.  BACKGROUND

The history of the Cable Act is recounted in detail in *Turner Broadcasting System, Inc. v. FCC (Turner II)*, 520 U.S. 180 (1997), and *Turner Broadcasting System, Inc. v. FCC (Turner I)*, 512 U.S. 622 (1994). As the Court noted in *Turner II*:

> [The] must-carry [requirement in the Cable Act] was designed to serve three interrelated interests: (1) preserving the benefits of free, over-the-air local broadcast television, (2) promoting the widespread dissemination of information from a multiplicity of sources, and (3) promoting fair competition in the market for television programming. . . . [E]ach of those is an important governmental interest. We have been most explicit in holding that protecting noncable households from loss of regular television broadcasting service due to competition from cable systems is an important federal interest. Forty percent of American households continue to rely on over-the-air signals for television programming. Despite the growing importance of cable television and alternative technologies, broadcasting is demonstrably a principal source of information and entertainment for a great part of the Nation's population. We have identified a corresponding governmental

purpose of the highest order in ensuring public access to a multiplicity of information sources. And it is undisputed the Government has an interest in eliminating restraints on fair competition, even when the individuals or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment.

520 U.S. at 189-90 (citations and quotations omitted).

Likewise, the events leading to the Viewability Rule, and its content and purposes, are fully explored in *C-SPAN v. FCC*, 545 F.3d 1051, 1052-54 (D.C. Cir. 2008). The court noted that the Viewability Rule was adopted in response to "the prospect that some local broadcast stations might not be available to analog cable subscribers." *Id.* at 1053. The Viewability Rule required that,

to the extent that cable subscribers do not have the capability of viewing digital signals, cable systems must carry the signals of commercial and non-commercial must-carry stations in analog format to those subscribers, after downconverting the signals from their original digital format. Under separate regulations promulgated in 2001 regarding material degradation, 47 U.S.C. §§ 534(b)(4)(A), 535(g)(2), where a must-carry broadcaster delivers its signal to a cable operator in [High-Definition] HD digital format (as opposed to [Standard-Definition] SD), the cable operator is required to transmit the must-carry station in HD. Thus, the combined effect of the material degradation regulations and the *Viewability Order* is that cable systems with analog and digital subscribers ("hybrid systems") are effectively required to allocate two channels to each must-carry HD broadcaster. Alternatively, cable systems are permitted to become all-digital, with all subscribers

able to view digital signals; under this option, only digital must-carry signals need be broadcast. The Commission specified that "any downconversion costs will be borne by the cable operator," and further provided that the viewability mandate would apply for an initial three-year period following the February 2009 digital transition date.

*Id.* (some citations, quotations, and alterations omitted).

Because the decisions in *Turner I*, *Turner II*, and *C-SPAN* adequately explain the histories of the Cable Act and the Viewability Rule, it is unnecessary to repeat these narratives in full here. Rather, we will focus on the Sunset Order and the Commission's justifications for adopting a new rule to replace the expiring Viewability Rule.

When the Cable Act was passed, most broadcasters' programs were in analog format, most cable companies transmitted in analog, and most cable subscribers had analog television sets. As a result, no serious problems were encountered in the early 1990s when cable companies transmitted must-carry broadcasters' programs to viewers. However, when Congress enacted the Cable Act, it was prescient in anticipating that significant technological changes were on the horizon. In a provision entitled "Advanced television," the statute provides that:

At such time as the Commission prescribes modifications of the standards for television broadcast signals, the Commission shall initiate a proceeding to establish any changes in the signal carriage requirements of cable television systems necessary to ensure cable carriage of such broadcast signals of local commercial television

> stations which have been changed to conform with such modified standards.

47 U.S.C. § 534(b)(4)(B). The FCC was thus charged with prescribing "modifications of the standards for television broadcast signals" to account for technological and market changes. *Id.*

The advent of digital television brought new challenges to the continued fulfillment of the Cable Act's objectives. In 1997, Congress and the FCC adopted plans to transition the broadcast industry from analog to digital technology, setting December 31, 2006 as the initial deadline. *Advanced Television Systems and Their Impact upon the Existing Television Broadcast Service*, Fifth Report and Order, 12 FCC Rcd. 12,809, 12,850 (1997); 47 U.S.C. §§ 309(j)(3), 309(j)(14)(A) (2004). Congress later enacted legislation setting February 17, 2009 as the deadline for the digital transition. Digital Television Transition and Public Safety Act of 2005, Pub. L. No. 109-171, § 3002, 120 Stat. 4, 21-22 (2006). This deadline was later changed to June 12, 2009. While broadcasters were obliged to switch to digital technology, cable operators remained free to transition from analog to digital services, or to offer both services, as they saw fit. The Viewability Rule was promulgated in anticipation of the broadcasters' switching from analog to all-digital programming.

When it adopted the Viewability Rule, the Commission recognized that after the broadcasters' transition to digital programming, there would continue to be a large number of cable subscribers with analog-only television sets – approximately 35 percent of all television households – that would be incapable of processing digital signals. Viewability Rule, 22 FCC Rcd. at 21,065 n.3. The Commission also

understood that the cable industry's own transition to digital would take some period of time beyond the broadcasters' transition. Therefore, it adopted a rule giving cable systems two choices to ensure that viewers with analog television sets would still be able to receive broadcasters' programs after the digital transition: (1) convert all operations to digital, which would require that all subscribers have the necessary equipment to view the signal – either a digital television capable of displaying the digital cable signal or a converter that would allow an analog television to display a digital cable signal; or (2) downconvert must-carry stations to an analog format that could be decoded by analog television sets without additional equipment. The Commission explained that downconversion was necessary because without it "the signals of must-carry stations w[ould] be completely unavailable to analog cable subscribers" following the digital transition. *Id.* at 21,091. The rule was set to sunset in 2012, five years after its adoption and three years after the deadline for the digital transition.

In limiting the Viewability Rule to three years, the Commission stated:

> In light of the numerous issues associated with the transition, *it is important to retain flexibility as we deal with emerging concerns*. A three-year sunset ensures that both analog and digital cable subscribers will continue to be able to view the signals of must-carry stations, and provides the Commission with the opportunity after the transition to review these rules in light of the potential cost and service disruption to consumers, and the state of technology and the marketplace.

*Id.* at 21,070 (emphasis added).

On February 10, 2012, the Commission issued a Notice of Proposed Rulemaking ("NPRM") proposing to extend the Viewability Rule to "June 12, 2015, unless the Commission extends the requirements prior to that date." *Carriage of Digital Television Broadcast Signals*, Fourth Further Notice of Proposed Rulemaking and Declaratory Order, 27 FCC Rcd. 1713, 1727 (2012). The NPRM sought comment on whether to extend the Viewability Rule for an additional period of time to ensure that cable subscribers "with analog equipment[] continue to have access to must carry television signals." *Id.* at 1714. The FCC stated that it was "bound by statute to ensure that must-carry signals are actually viewable by all subscribers." *Id.* at 1715. It sought comment, among other things, on the pace of cable operators' own transition to digital, which, as noted above, would eliminate the need for the Viewability Rule. *Id.* at 1719-20. However, the NPRM also noted that, if the Viewability Rule expired, "many cable subscribers would be required to pay more for access to must-carry broadcast stations, by replacing existing and still-functional analog equipment with digital equipment or leasing set top boxes to view the complete service they currently pay for and receive in analog." *Id.* at 1718. With this in mind, the Commission's NPRM gave clear notice that many options were open to the Commission going forward:

> [W]e seek comment on how the sunset of the viewability requirement would impact the financial resources of must carry stations. We seek specific information that will allow us to build a solid record that supports either the retention or the sunset of the viewability rule. Also, given that "viewability" of must-carry digital signals is mandated by the Communications Act, we seek comment on whether it is necessary to extend the rule in its current form as opposed to relying on stations to file carriage

complaints to enforce compliance with the statutory mandate.

*Id.*

The rulemaking record reveals that extraordinary changes occurred both in technology and in the marketplace during the time between the promulgation of the Viewability Rule in 2007 and the adoption of the Sunset Order in 2012:

> In 2007, roughly half of all television households were analog-only cable subscribers, and there were no inexpensive converters available to ensure that analog subscribers would have the equipment needed for viewability. In those circumstances, a significant number of cable customers could lose access to must-carry channels if hybrid systems were permitted to carry such signals only in digital format.

> Today, by contrast, the state of technology and the marketplace is significantly different. At the time of the order, about 20 percent of cable subscribers received analog-only service. The Commission expected that number to drop below 16 percent by the end of 2012. Since cable accounts for about half of all television households, analog-only subscribers were expected to make up about 8 percent of the total television audience – down from 40 percent five years earlier. And that number is falling: the Commission predicted that the number of analog cable subscribers is expected to continue to decrease as more cable customers choose to upgrade to full digital service and as more hybrid cable systems complete their transition to all-digital systems.

Br. for Resp't at 13-14 (citations, quotations, and alterations omitted).

In comments opposing the sunset of the Viewability Rule, the broadcasters argued that "allowing the current viewability rule to expire on schedule will threaten the viability of must-carry stations. According to the broadcasters, approximately 12.6 million households receive only analog cable service, representing approximately 11 percent of all U.S. television households, and removing that percentage of a station's audience could well have a profound impact on affected stations." Sunset Order, 27 FCC Rcd. at 6541-42 (quotation omitted). In response, the Commission noted that:

> [T]he broadcasters' analysis overstates the impact on such stations because it assumes that elimination of the rule will automatically result in the broadcaster's signal being unavailable to all analog subscribers. To the contrary, our new statutory interpretation – which hinges on a cable operator making equipment available at no cost or an affordable cost – will ensure that subscribers on hybrid systems may continue to access these signals at little or no additional expense.

*Id.* at 6542.

In the NPRM, the Commission reported that a "recent survey indicates that 31 percent of homes do not have a digital television." 27 FCC Rcd. at 1718 n.34. However, through the notice and comment process, it also found that many of these consumers are already subscribing to digital services by using converting equipment at home to view the signals on analog sets. The FCC explained that, according to industry reports, "about 27 million DTAs [Digital Transport

Adapters, which are consumer-operated converters] were already deployed by year-end 2011," Sunset Order, 27 FCC Rcd. at 6540, and that some cable operators provide the adapters to customers for free and others charge a nominal fee of $1 or $2 per month, *id.* at 6541. And because most televisions sold since 2007 are digital-ready, an increasing number of customers are prepared for digital service simply through the television sales market. *Id.* at 6539 n.59.

After considering the comments submitted in the rulemaking proceeding, the FCC issued the Sunset Order which allowed the Viewability Rule to expire with only a six-month extension. The Commission reasoned that, with the increased number of digital subscribers and the availability of cheap or free conversion devices, it was no longer necessary or efficient to continue burdening cable companies with the obligation to downconvert broadcast programs. Under the Sunset Order, cable subscribers with analog television sets may be required by their cable companies to purchase or lease equipment that converts broadcast signals from digital to analog. Hybrid cable companies are thus no longer required to downconvert digital signals to subscribers with analog television sets.

In sum, the disputed Sunset Order allows an equipment-based alternative to downconversion, giving cable operators "flexibility" to cease carriage of analog must-carry signals. In other words, the new rule permits cable operators to satisfy the statutory viewability mandate with an "offer" of additional equipment, provided that the equipment is "affordable." The availability of the must-carry stations is still required by statute; however, cable companies may now choose to downconvert, to switch all their operations to digital distribution, or to provide analog subscribers with low or no-cost conversion devices.

## II. DISCUSSION

### A. *Chevron* Step One

The Petitioners' first argument is that, "[a]pplying traditional tools of statutory construction, it is evident from the plain language and structure of Section 614(b)(7), its legislative history, the essential purpose of the must-carry regime, and the Cable Act's overall statutory scheme that Congress intended that must-carry signals be actually viewable without added equipment." Joint Br. for Pet'rs at 20. Thus, according to Petitioners, the Sunset Order is "unlawful" because it is based on a "new statutory interpretation" that "conflicts with Congress's unambiguously expressed intent." *Id.* at 20-21. This argument does not square with the plain meaning of the text, historical context, or the overall purpose of the Cable Act.

Under *Chevron* Step One, if Congress "has directly spoken to the precise question at issue," the court and the agency "must give effect to the unambiguously expressed intent." *Chevron*, 467 U.S. at 842-43. The statute states only that must-carry broadcast signals "*shall be viewable via cable on all television receivers of a subscriber which are connected to a cable system by a cable operator or for which a cable operator provides a connection.*" 47 U.S.C. § 534(b)(7). Petitioners say that "this Section mandates that must-carry signals be actually viewable. The *Order* falls short of this legal standard, adopting a regime that, at best, ensures only that cable operators that have not yet transitioned to all-digital will *offer* consumers the ability to make signals viewable on analog receivers using additional purchased or leased equipment." Joint Br. for Pet'rs at 21. The fallacy in Petitioners' argument is that it assumes that actual viewability is not permissibly achieved if subscribers are required to use

equipment beyond their televisions to receive must-carry signals. The statute simply does not require what Petitioners seek because "viewable" is susceptible to the Commission's reading, *i.e.*, viewable *with the assistance of a low- or no-cost converter*.

Petitioners argue, in effect, that Congress spoke definitively on a narrow, technological issue concerning technology *that was not in wide use* at the time of enactment. The viewability requirement, enacted in 1992, was written before a digital transition was even contemplated by Congress, so it is fruitless to speculate on what amount of equipment Congress meant to allow in order to ensure that *digital* electronic signals would be viewable. Furthermore, electronic signals – whether analog or digital – are not actually "viewable" to the human eye, so it is clear that Congress understood that *some* equipment or process would be required to allow viewers to see broadcast programs. As noted above, in enacting § 534(b)(4)(B), Congress left it to the Commission to determine how best to implement the viewability requirement to account for technological and market changes.

In January 2001, in its first report and order applying the carriage requirements to digital signals, the FCC noted that "[a]llowing digital-to-analog conversion for a limited time during a critical stage of the transition period" would facilitate the overall transition. *Carriage of Digital Television Broadcast Signals*, First Report and Order, 16 FCC Rcd. 2598, 2630 (2001). In 2007, after the digital transition was underway, the Commission evaluated the market and determined that there were still so many analog customers that, in order to successfully make the must-carry channels "viewable" to all customers, the cable companies should be required, for the next five years, to downconvert those

channels to analog before transmitting them to analog customers. The Commission never said that *downconversion* was mandated by the statute. It was merely a means to achieve an end. And nothing in the record indicates that the FCC or any of the affected parties expected downconversion to be a permanent obligation imposed upon cable companies. Indeed, the Viewability Rule, which imposed the downconversion requirement, was scheduled to sunset three years after its effective date.

Furthermore, under the FCC's 2001, 2007, and 2012 rules, analog subscribers were required to install additional equipment in order to receive broadcasters' digital programs whenever a cable company switched from "hybrid" to all-digital service. Neither Congress nor the FCC has ever stated that the statutory viewability requirement cannot be met if subscribers are required to use equipment beyond their televisions to receive must-carry signals. Therefore, § 534(b)(7) cannot be construed otherwise. And the literal terms of § 534(b)(7) certainly do not support the interpretation advanced by Petitioners.

Petitioners also contend that the FCC's order violates § 534(b)(4)(A), which provides that "[t]he signals of local commercial television stations that a cable operator carries shall be carried without material degradation," and that "the quality of signal processing and carriage provided by a cable system for the carriage of local commercial television stations will be no less than that provided by the system for carriage of any other type of signal." Petitioners argue that the Commission's order "runs afoul of this provision by allowing cable operators to provide better carriage conditions – *i.e.*, a viewable format – for some signals than they do for others." Joint Br. for Pet'rs at 29. This argument presupposes that digital signals that are not downconverted by cable operators

are not in a viewable format, a contention that we have already rejected. The *quality* of the picture being transmitted is the same whether it is downconverted by the cable company or converted by the customer, and Petitioners offer no credible evidence to the contrary. Therefore, Petitioners' arguments resting on § 534(b)(4)(A) certainly do not indicate that the FCC's new rule violates the plain meaning of the statute.

In sum, we reject Petitioners' arguments under *Chevron* Step One.

### B. *Chevron* **Step Two**

During oral argument, counsel for Petitioners pointed out that, under the Sunset Order, the FCC requires only that customers have access to a viewable signal, and leaves it to them to seek out the equipment necessary to convert a digital signal to analog. In other words, in abandoning the Viewability Rule, the Commission now requires analog subscribers to obtain, pay for, and install additional equipment to receive must-carry signals. According to Petitioners' counsel, the real issue in this case is who assumes the burden – in terms of paying for, providing, and installing the necessary equipment – of ensuring that analog subscribers can view digital transmissions. Petitioners suggest that the Commission's new rule, which shifts the burden from the cable companies to the subscribers is manifestly contrary to the Cable Act and, therefore, cannot survive review under *Chevron* Step Two. *See Chevron*, 467 U.S. at 843-44.

Petitioners do not seriously dispute that, if the FCC was not limited by the plain meaning of the Cable Act and acted pursuant to delegated authority, it was free to revise its interpretation of the viewability requirement to take account

of changed circumstances. As the Supreme Court has noted, "[a]n agency is not required to establish rules of conduct to last forever, but rather must be given ample latitude to adapt its rules and policies to the demands of changing circumstances." *Rust v. Sullivan*, 500 U.S. 173, 186-87 (1991) (quotations, citations, and alteration omitted); *accord FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009). The only question we face is whether the Sunset Order's interpretation of the viewability requirement is "permissible under the statute." 556 U.S. at 515. We cannot "substitute our judgment for the agency's, especially when, as here, the decision under review requires expert policy judgment of a technical, complex, and dynamic subject." *Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1311 (D.C. Cir. 2010). We must accord "substantial deference" to the FCC's predictive judgments. *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 716 (D.C. Cir. 2011).

The disputed statutory language in this case – Section 614(b)(7) – is ambiguous. Therefore, the FCC had latitude, within the bounds of the statute, "to adapt [its] rules and policies to the demands of changing circumstances." *Rust*, 500 U.S. at 187. We find that, in promulgating the Sunset Order, the Commission acted reasonably within the compass of its delegated authority. The Sunset Order is clearly supported by changed circumstances – including advancing technology and changes in the marketplace – and reasoned decisionmaking. The order reflects a permissible interpretation of the Cable Act and therefore survives review under *Chevron* Step Two.

Petitioners argue that forcing analog subscribers to carry the burden of securing, paying for, and installing the equipment necessary to convert digital signals is not compatible with the Cable Act. In support of this claim,

Petitioners point to the structure of Section 614(b)(7), which states:

> Signals carried in fulfillment of the requirements of this section shall be provided to every subscriber of a cable system. Such signals shall be viewable via cable on all television receivers of a subscriber which are connected to a cable system by a cable operator or for which a cable operator provides a connection. If a cable operator authorizes subscribers to install additional receiver connections, but does not provide the subscriber with such connections, or with the equipment and materials for such connections, the operator shall notify such subscribers of all broadcast stations carried on the cable system which cannot be viewed via cable without a converter box and shall offer to sell or lease such a converter box to such subscribers at rates in accordance with section 543(b)(3) of this title.

47 U.S.C. § 534(b)(7). According to Petitioners, "[t]he Commission's new interpretation conflicts with the statutory structure . . . because it renders the distinction between the second and third sentences of Section 614(b)(7) meaningless." Joint Br. for Pet'rs at 22. Petitioners misread the statute.

> As the Commission points out:

> The second and third sentences of the statute address different situations and perform distinctive functions. The second sentence – which contains the viewability requirement that applies only to must-carry stations – applies only to subscribers who are "connected to a cable system by a cable operator or for which a cable operator provides a connection." 47 U.S.C. § 534(b)(7). By contrast, the third sentence, which applies more broadly

to "all broadcast stations," requires cable operators to offer or sell converter boxes to subscribers to whom the operator "does *not* provide" additional receiver connections or "the equipment and materials for such connections." *Ibid.* (emphasis added). Thus, the third sentence ensures that cable operators may not simply refuse necessary equipment to customers who choose to install their own connections, a function not addressed by the second sentence. Moreover, the required price for boxes supplied under the second sentence to satisfy the viewability requirement – free or nominal – may be less than the price for boxes supplied under the third sentence, which can be based on the cost of the equipment.

Br. for Resp't at 21-22.

Petitioners' arguments regarding congressional intent and the objectives of the must-carry regime are similarly unavailing. The FCC has, as required by Congress, constantly adapted its enforcement of the must-carry regime, from its first implementation in 1994 to the tentative consideration of downconversion in 2001, its adoption in 2007, and its sunset in 2012. The flexibility demonstrated by this constantly adjusted approach reflects the realities of the market and the FCC's role as an expert agency delegated authority to exercise its judgment.

Finally, in terms of whether a consumer-operated conversion device can, practically speaking, make a signal "viewable," the FCC has reasonably determined that technology is now advanced enough to fulfill the statute's requirements. Low-cost converter boxes that can be installed in consumers' homes are, according to the record, now widely available and in use in 27 million homes. Given these dramatic shifts in the market and the increased feasibility of

consumer-operated conversion devices, it was within the agency's discretion to decline to continue requiring cable companies to bear the expense of downconversion for a shrinking audience with easily obtainable alternate means of accessing the must-carry channels.

On the basis of these considerations, we hold that the Sunset Order is not manifestly contrary to the viewability requirement under the Cable Act.

## C.   Arbitrary and Capricious Review

The same points that address Petitioners' *Chevron* Step Two claim also make it clear that their arbitrary and capricious claim fails. The analysis of disputed agency action under *Chevron* Step Two and arbitrary and capricious review is often "the same, because under *Chevron* step two, [the court asks] whether an agency interpretation is arbitrary or capricious in substance." *Judulang v. Holder*, 132 S. Ct. 476, 483 n.7 (2011) (citing *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 711 (2011)). "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. The Sunset Order suffers from none of these infirmities. It is "rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *Id.* at 42.

The evidence in the record is sufficient to support the FCC's finding that an equipment-based means of complying

with the Cable Act is "effective" in providing "viewable" signals as required. As noted above, the marketplace and technology have shifted dramatically in the past several years, and the Commission reasonably concluded that the number of analog customers is dropping rapidly and that low-cost digital equipment is now "readily available" as an option to analog cable customers. Sunset Order, 27 FCC Rcd. at 6537-39. Without any contrary evidence to disprove these findings, Petitioners have not shown any arbitrary and capricious action or abuse of discretion on the part of the Commission.

Furthermore, there is nothing in the record to support the Intervenors' assertion that the Sunset Order will drive broadcasters out of business. On this point, the record contains only a dubious study from the National Association of Broadcasters on the financial effect of the Viewability Rule's sunset on must-carry stations, which assumes that *none* of the 12.6 million analog customers reported in 2012 will actually obtain the conversion equipment to continue viewing digital must-carry channels on their analog sets (or upgrade to digital sets and view the must-carry stations directly). National Association of Broadcasters' *Ex Parte* Communication, CS Docket No. 98-120, *reprinted in* Joint Appendix ("J.A.") 170, 173 ("We will examine the impact of the loss of 11% of viewership on certain types of stations and estimate the effects on the financial health of these stations."). According to the evidence before the Commission as of June 2012, during the years when the downconversion rule was in effect, the number of analog subscribers dropped from about 40 million households to 12 million households and was expected to drop below 10 million households by the end of the year. Sunset Order, 27 FCC Rcd. at 6539. In other words, the impact of the Sunset Order is diminishing rapidly, as cable viewers switch to digital subscriptions that are compatible with must-carry broadcasts. It is self-evident that the loss of

downconversion services will have some effect on broadcasters, but the Commission was "not persuaded" that allowing the Viewability Rule to expire will "threaten the viability of must-carry stations," *id.* at 6541, and Petitioners have offered no viable evidence to contradict its findings.

Petitioners also contended at oral argument that under the new regulatory regime hybrid cable companies will be able to give their customers superior access to their own analog programs by downconverting *those* channels and then requiring customers to go out and buy new equipment to get access to the must-carry stations. Petitioners say that such practices will be at odds with the viewability mandate and the non-degradation and signal quality requirements found in § 534(b)(4). This is a valid concern, and it certainly animated the Commission's rulemaking in 2007. But there is no evidence to indicate that this possibility will become a reality.

Moreover, the Commission's Sunset Order states that,

a must-carry station may file a complaint pursuant to Section 76.61 of our rules if it believes a cable operator has failed to meet its statutory carriage obligations. [*See* 47 C.F.R. § 76.61.] In addition, we will consider informal consumer complaints when evaluating compliance with the statutory viewability requirement. If we receive a significant number of well-founded consumer complaints that an operator is not effectively making affordable set-top boxes available to customers in lieu of analog carriage of a channel, one of the possible remedies would be to require the operator to resume analog carriage of the channel.

Sunset Order, 27 FCC Rcd. at 6546. If, in fact, the cable companies respond to the FCC's Order by raising prices on

the conversion devices or making them otherwise inconvenient for customers to obtain, they will be subject to customer complaints, broadcaster complaints, and agency action.

In sum, we find that the FCC's new rule is supported by changed circumstances, credible evidence, and reasoned decisionmaking. The Sunset Order therefore survives arbitrary and capricious review.

### D.   Adequacy of the Notice of Proposed Rulemaking

Finally, Petitioners argue that the Sunset Order "violates the APA because the Commission failed to provide interested parties with adequate notice that it was considering an equipment-based alternative." Joint Br. for Pet'rs at 52. We find no merit in this contention.

When an agency promulgates a rule pursuant to congressionally delegated authority, it must provide the public with adequate notice of the proposed rule followed by an opportunity to comment on the rule's content. 5 U.S.C. § 553(b)(3) (requiring agencies to provide notice of proposed rulemaking that includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved"). The final rule need not be the one proposed in the NPRM. Rather, "[a]n agency's final rule need only be a logical outgrowth of its notice." *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 548 (D.C. Cir. 2006) (quotation omitted).

> An agency's final rule qualifies as the logical outgrowth of its NPRM "if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *CSX Transp., Inc. v.*

*Surface Transp. Bd.*, 584 F.3d 1076, 1079–80 (D.C. Cir. 2009). By contrast, a final rule fails the logical outgrowth test and thus violates the APA's notice requirement where "interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *Id.* at 1080.

EDWARDS, ELLIOTT & LEVY, FEDERAL STANDARDS OF REVIEW 195 (2d ed. 2013).

The Commission's February 2012 NPRM stated that the Viewability Rule would "expire on June 12, 2012 unless we take action to extend it," and sought comment on "whether it would be in the public interest to extend" the rule for three more years. 27 FCC Rcd. at 1713-14. The NPRM also stated that, if the Viewability Rule expired, "many cable subscribers would be required to pay more for access to must-carry broadcast stations, by replacing existing and still-functional analog equipment with digital equipment or leasing set top boxes to view the complete service they currently pay for and receive in analog." *Id.* at 1718. The final action taken by the FCC was not something that the agency had expressly proposed in its NPRM. Nonetheless, the Commission clearly solicited comment on whether it should allow the Viewability Rule to sunset and explained that subscribers might be required to pay for and use digital equipment in place of downconversion to view digital programs from must-carry broadcasters. This notice was more than adequate to alert must-carry broadcasters that the rule requiring downconversion might be in jeopardy.

Petitioners argue that the FCC "expressly proposed to extend the viewability rule until June 12, 2015," and that interested parties only learned that the agency was considering an equipment-based proposal "through press

accounts." Joint Br. for Pet'rs at 52. Petitioners are right in pointing out that an agency "cannot bootstrap notice from a comment, . . . or from third-party accounts of what the agency might be considering." *Id.* (citing *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983); *Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991)). But Petitioners are wrong in suggesting that notice is inadequate if the NPRM and the final rule are not coterminous. Whether the "logical outgrowth" test is satisfied depends on whether the affected party "should have anticipated" the agency's final course in light of the initial notice. *Small Refiner*, 705 F.2d at 548-49. The broadcasters in this case certainly should have anticipated that the final rule was a viable result in light of the NPRM, and also in light of the fact that the Viewability Rule was due to sunset unless extended.

As the FCC convincingly argues:

The Commission described the proceeding initiated by the *Sunset Notice* as "an opportunity . . . to determine whether extending the current rule is necessary to fulfill th[e] statutory [viewability] mandate, *given the current state of technology* and the marketplace." *Id.* ¶5 (J.A. 71) (emphasis added). In particular, the Commission noted that set-top boxes would be required in the absence of an analog carriage requirement and asked interested parties to provide data on "the range of costs per digital [converter] box . . . , and the range of rental fees" for boxes, and "any marketplace or other changes" since 2007. *Id.* ¶¶10, 13, 16 (J.A. 74, 75, 77). Market developments such as the availability and cost of signal converters were plainly raised as topics relevant to the Commission's ultimate decision.

Furthermore, the Commission noted in the *Sunset Notice* that in the *Viewability Order* it had considered and rejected "possible alternatives," such as "a rule that would allow [cable systems] to carry must-carry signals in digital so long as they made [signal conversion] equipment available for lease or sale to subscribers." *Sunset Notice* ¶14 & n.48 (JA 76). When the agency called for comment on "proposals that would achieve the results necessary to assure the viewability of must carry signals through an approach different than that of [the] existing rule," including solutions "that will satisfy the statute in a less burdensome manner," *id.* ¶16 (JA 77), it was referring to such things as the previously rejected approach. The *Sunset Notice* thus unquestionably gave interested parties fair notice that device-based viewability was one of the issues presented.

Br. for Resp't at 58-60. We agree.

## III. CONCLUSION

For the reasons given above, we hereby deny the petition for review.

KAVANAUGH, *Circuit Judge*, concurring: I join the Court's fine opinion in full. I add this brief separate opinion simply to note that the FCC also invoked the principle of constitutional avoidance to support its result here. In my view, the Commission was right to perceive a serious First Amendment problem with the Viewability Rule.

In its Order allowing the Viewability Rule to sunset, the FCC explained that "dramatic changes in technology and the marketplace" since the adoption of the Viewability Rule in 2007 had rendered "less certain the constitutional foundation for an inflexible rule compelling carriage of broadcast signals in both digital and analog formats." *Carriage of Digital Television Broadcast Signals*, Fifth Report and Order, 27 FCC Rcd. 6529, 6537 (2012). As a result of those dramatic marketplace changes, the FCC concluded that it could no longer justify "imposing a rigid analog-carriage requirement on cable operators, where the record establishes a reasonable, less burdensome alternative that meets the statutory objectives." *Id.*

The dramatically changed marketplace that the Commission aptly recognized in this case undermines the constitutional foundation of the Viewability Rule and, indeed, of the broader must-carry regime as well. In the Cable Television Consumer Protection and Competition Act of 1992, Congress imposed many significant restrictions – including the must-carry regime – that infringe on cable operators' "editorial discretion over which stations or programs" to carry. *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 636 (1994) (*Turner I*) (quoting *Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 494 (1986)); *see* Cable Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460. The Supreme Court upheld the must-carry requirements against a First Amendment challenge only after determining that must-carry advanced "important governmental interests unrelated to the suppression of free

speech" and did "not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189 (1997) (*Turner II*) (applying "intermediate scrutiny").

*Turner* identified the important governmental interest underlying the regulations as the interest in counteracting the effects of monopoly. And *Turner* rested its approval of the must-carry regime on the fact that cable operators in the early 1990s possessed "bottleneck monopoly power." *Turner I*, 512 U.S. at 661; *see* Cable Act of 1992, § 2(a)(2) (finding "undue market power for the cable operator"). Only because of the "real threat" that cable operators would exploit their monopoly power and discriminate unfairly against disfavored or unaffiliated broadcasters did the Court approve Congress's dictate forcing cable operators to carry the signals of certain preferred broadcasters. *Turner II*, 520 U.S. at 196 (controlling opinion of Kennedy, J.).

Things have changed. In the two decades since Congress enacted the Cable Act of 1992, the video programming marketplace has radically transformed. Cable operators today face intense competition from a burgeoning number of satellite, fiber optic, and Internet television providers – none of whom are saddled with the same program carriage and non-discrimination burdens that cable operators bear. As this Court has flatly stated, cable operators "no longer have the bottleneck power over programming that concerned the Congress in 1992." *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009); *see also Comcast Cable Communications, LLC v. FCC*, 717 F.3d 982, 992-94 (D.C. Cir. 2013) (Kavanaugh, J., concurring); *Cablevision Systems Corp. v. FCC*, 597 F.3d 1306, 1316 (D.C. Cir. 2010) (Kavanaugh, J., dissenting); Randolph J. May, *Charting a New Constitutional Jurisprudence for the Digital Age*, 3 CHARLESTON L. REV.

373, 393-94 (2009); Christopher S. Yoo, *Vertical Integration and Media Regulation in the New Economy,* 19 YALE J. ON REG. 171, 229 (2002); Note, *Enabling Television Competition in a Converged Market*, 126 HARV. L. REV. 2083 (2013); R. Matthew Warner, Note, *Reassessing* Turner *and Litigating the Must-Carry Law Beyond a Facial Challenge*, 60 FED. COMM. L.J. 359 (2008).

Unsurprisingly, cable regulations adopted in the era of *Cheers* and *The Cosby Show* are ill-suited to a marketplace populated by *Homeland* and *House of Cards*. And the constitutional problems infecting the 1992 Cable Act's various program carriage and non-discrimination requirements grow more significant every day, as new video programming distributors emerge and prosper. The upshot is that the cable "bottleneck monopoly" on which *Turner* rested no longer exists – and, as a result, the Act's infringements on cable operators' editorial discretion no longer can withstand First Amendment scrutiny.

*Turner*'s conclusion was expressly based on the state of the marketplace in the early 1990s. *See Turner II*, 520 U.S. at 197-207 (controlling opinion of Kennedy, J.). Contrary to petitioners' suggestion to this Court, a Supreme Court decision that says, in essence, "Because there is now a monopoly, this regulation is permissible" does not mean "Even when there is no monopoly, this regulation is permissible." *Cf. Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 161 (2d Cir. 2013). Suppose the Supreme Court considers an antitrust case and concludes that Company X has an 80 percent market share, that anything over 50 percent constitutes market power in that market, and that it is unlawful under the antitrust laws for a company such as Company X with market power to engage in certain activities. In a future case, a lower court would be bound by vertical

stare decisis to say that a company with a market share over 50 percent in the relevant market had market power and thus could not lawfully engage in those activities. But if Company X's market share in the relevant market declined to 10 percent – meaning that it no longer had market power – a lower court would obviously not be bound to hold that Company X still could not engage in those activities. So it is here. A contrary approach to precedent in these circumstances would reflect a mindless perversion of stare decisis, not a faithful application of stare decisis.

When the cable operators' monopoly collapsed, the constitutional foundation supporting the 1992 Cable Act's program carriage and non-discrimination regimes collapsed with it. Stare decisis requires courts (and, in the first instance, the FCC) to carefully and faithfully follow the constitutional principles that undergird *Turner*: First, "cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment." *Turner I*, 512 U.S. at 636. And second, absent a finding of market power, the Government may not infringe on the cable operators' editorial discretion. *See id.* at 661. Applying those principles to today's highly competitive video programming distribution marketplace leads to an entirely different result than it did 20 years ago. Because cable operators no longer wield market power, the Government can no more tell a cable operator today which video programming networks it must carry than it can tell a bookstore what books to sell or tell a newspaper what columnists to publish.

In short, as a matter of constitutional law and technological reality, the 1992 Cable Act's various program carriage and non-discrimination regimes rest on a hollowed-out foundation. The Commission was right to see the First Amendment problem in this case – and further cases like this

no doubt loom on the horizon.  With that observation, I join the opinion of the Court.